Nell A. CAMMACK; Genie Lucas; Douglas Paul Root; Carolyn L. Stapleton; and Michele Wallace, Plaintiffs,

v.

John WAIHEE in his capacity as Governor of the State of Hawaii, Alfred Lardizabal in his capacity as Director of Personnel Services of the State of Hawaii, Frank F. Fasi in his capacity as Mayor of the City and County of Honolulu, Jeremy Harris in his capacity as Managing Director of the City and County of Honolulu, and Loretta K. Fukuda in her capacity as the Director of Civil Service of the City and County of Honolulu; United Public Workers, Local 646, AFSCME; Hawaii Government Employees' Association, Local 152, AFSCME; Hawaii State Teachers Association; University of Hawaii Professional Assembly; Hawaii Fire Fighters Association, Local 1463, IAFF; and State of Hawaii Organization of Police Officers, Defendants.

Civ. No. 87-0260.

United States District Court,
D. Hawaii.

Nov. 23, 1987.

Daniel Foley, ACLU, Kirk Cashmere, Honolulu, Hawaii, for plaintiffs.

Herbert Takahashi, Honolulu, Hawaii, for United Public Workers, Local 646, AFSCME.

Warren Price, Steven Michaels, Honolulu, Hawaii, for John Waihee, Alfred Lardizabal.

Gill Park, Park & Kim, T. Anthony Gill, Honolulu, Hawaii, for HSTA & UHPA.

Rogers Ikenaga, Honolulu, Hawaii, for Fire Fighters, Local 1463, IAFF.

Richard Wurdeman, Sandra Simms, Corp. Counsel, Honolulu, Hawaii, for Frank Fasi, Jeremy Harris, Loretta Fukuda.

Georgiana Alvaro, Russell Higa, Shopo, Honolulu, Hawaii, for defendants.

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KAY, District Judge.

## I.

### Background

In 1941, the legislature of the Territory of Hawaii enacted a statute which declared Good Friday, the Friday preceding Easter, to be a legal holiday. This statute, which is now codified as Hawaii Rev.Stat. § 8–1, provides in pertinent part that Good Friday is "set apart and established as [a] state holiday[ ]."

In 1970, the Hawaii legislature enacted a statute which recognized that "joint decisionmaking [between public employees and their employers] is the modern way of administering government." Hawaii Rev. Stat. § 89–1. Accordingly, the legislature mandated that terms of public employment were to be determined through a process of collective bargaining. It is agreed by all parties hereto that the number and dates of paid leave days is a mandatory subject of collective bargaining. All collective bargaining agreements currently in effect between public employees and their employers state, either expressly or through incorporation of Hawaii Rev.Stat. § 8–1, that Good Friday is a paid leave day. These collective bargaining agreements cover approximately 65% of Hawaii's public employees.

The plaintiffs in this action have filed a suit praying this court for a declaration that the Hawaii statute which sets aside Good Friday as a legal holiday is unconstitutional as violative of the United States and Hawaii Constitutions. The plaintiffs' argument is premised on the Establishment Clause of the United State's Constitution's First Amendment, and Article I, Section 4 of the Hawaii Constitution. The plaintiffs also ask this court to rule that the collective bargaining agreements which provide for a day of paid leave on Good Friday are violative of the subject constitutional provisions.

This case came before the court on the plaintiffs' and the defendants' cross-motions for summary judgment. This court, having considered the memoranda in support of and in opposition to the motions, the record on file, and the arguments of counsel finds and orders as follows.

## II.

### Standing

The defendants argue that the plaintiffs in this action lack standing to prosecute

their suit. This court finds that the defendants' argument is not persuasive.

In *Flast v. Cohen,* 292 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), the plaintiffs brought suit to enjoin the allegedly unconstitutional expenditure of federal funds and argued that their standing to bring the suit derived from their status as taxpayers. The Court held that taxpayer standing was available to the plaintiffs, finding "no absolute bar in Article III to suits by federal taxpayers challenging allegedly unconstitutional federal taxing and spending programs." *Id.* at 1953. The Court went on to write in *Flast,* however, that mere taxpayer status is insufficient to establish standing to challenge an allegedly unconstitutional tax or expenditure. "[I]nquiries into the nexus between the status asserted by the litigant and the claim he presents are essential to assure that he is a proper and appropriate party to invoke federal judicial power." *Id.* Thus, even a taxpayer must present an Article III "case or controversy" before he or she may have a day in court.

The contours of an Article III "case or controversy" were defined by the Supreme Court in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). In *Valley Forge,* the Court wrote that

"at an irreducible minimum, Article III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' "

*Id.* at 758 (citations omitted). The *Valley Forge* opinion also firmly established that taxpayer standing is only appropriate in those cases in which legislative action pursuant to the taxing and spending powers is challenged. *Id.* at 762–64. Finally, it should be noted that while *Flast* and *Valley Forge* both dealt with challenges to an action taken by the federal legislature, subsequent opinions of the Supreme Court have extended taxpayer standing to parties who have challenged the actions of state legislatures. *See for example Grand Rapids School District of the City of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 3221 n. 5, 87 L.Ed.2d 267 (1985) (the Court has adjudicated cases involving Establishment Clause challenges to state expenditures).

Applying the foregoing precepts to the instant case leads this court to the conclusion that the plaintiffs herein have adequately established their entitlement to a day in court. As in *Flast,* the plaintiffs in this case have alleged that the Hawaii legislature expends substantial sums of money each year to advance religion. Specifically, the plaintiffs have provided this court with evidence supporting a claim that the personnel costs which are incurred each year in order to give those public employees who are covered by a collective bargaining agreement a day of paid leave on Good Friday amount to $3,400,000.00.

In *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), the Supreme Court adjudicated a case, apparently premised on taxpayer standing, in which the plaintiffs challenged the constitutionality of a city's decision to include a creche in an annual Christmas display. The creche, whose inclusion in the display gave rise to the alleged injuries in *Lynch,* was acquired by the city for $1,365.00. The annual expenses for erecting and dismantling the creche amounted to approximately $20.00 each year. Obviously, the state's annual expenditure in the instant case, amounting to millions of taxpayer dollars, far outshadows the apparent challenged expenditure, and concomitant injury, which the *Lynch* court found to give rise to a justiciable Establishment Clause challenge. This court further notes that the taxpayer standing in the *Lynch* case may have derived from the federal government's expenditure of millions of dollars necessitated by granting federal employees a paid holiday on Christmas. *Id.* at 1360–61. Thus, if the Supreme Court found no standing problem that would bar adjudication of the dispute in *Lynch,* it is unlikely that it

would find a standing problem in the instant case.

This court also finds that a favorable ruling in this case would remedy the plaintiffs' injuries. As noted above, the plaintiffs argue that they are injured because Hawaii Rev.Stat. § 8–1 impermissibly advances religion, and that therefore, the monies which are expended from the public fisc to effect the statute's mandate is an unconstitutional expenditure. If this court strikes down Hawaii Rev.Stat. § 8–1 as constitutionally flawed, the alleged entanglement between the State of Hawaii and religion would be terminated. Similarly, if this court finds that the subject collective bargaining agreements contain a fatal constitutional defect, the plaintiffs' alleged injuries would be remedied; either the collective bargaining agreements would be voided as contrary to public policy, or the collective bargaining agreements would have to be revised in the next round of negotiations to reflect the unconstitutionality of including Good Friday as a paid leave day.

For the foregoing reasons, this court finds that the plaintiffs have standing to raise their constitutional challenge in federal court.

## III.

### Abstention

The defendants in this case have argued that this court should abstain. The defendants maintain that the state courts of Hawaii should rule upon the merits of the instant controversy before this court becomes embroiled in "serious constitutional questions." In essence, this argument is premised on the claims that Hawaii courts could resolve the instant dispute through the application of Hawaii law and that Hawaii courts are amenable to the certification of important questions of Hawaii law by the federal court. The defendants' argument, then, is that the Supreme Court's opinion in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), calls for abstention in the instant case.

"Abstention from the exercise of federal jurisdiction is the exception, not the rule ... 'Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest.'" *Colorado River Water Conservation District v. U.S.*, 424 U.S. 800, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976), *citing County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959). The Supreme Court has succinctly defined the legal scenario in which *Pullman* abstention counsels a federal court to defer to a state court adjudication of a dispute. *Pullman* abstention is called for "in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law." *Colorado River*, 96 S.Ct. at 1244. The Ninth Circuit has explained the dual rationale of *Pullman* abstention: (1) "to permit state court interpretations of uncertain questions of state law" and (2) "to avoid premature adjudication of federal constitutional questions." *Carreras v. City of Anaheim*, 768 F.2d 1039 (9th Cir.1985).

This court first notes that it has undertaken its own review of those provisions of the Hawaii constitution which are applicable to the resolution of the instant case. This court has focused its inquiry on Article I, Section 4 of the Hawaii Constitution which contains a provision which is virtually identical to the First Amendment of the United States Constitution. The First Amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion." The Hawaii Constitution provides, in pertinent part, that "[n]o law shall be enacted respecting an establishment of religion." This court has found no case law which leads to a conclusion that the Hawaii courts interpret the Hawaii Constitution differently than the federal courts interpret the United States Constitution in the limited area of Establishment Clause jurisprudence. There is no indication that Hawaii courts, if afforded the opportunity, would accord any lesser or greater protection to

its citizens under its own Constitution than they are already afforded under the Constitution of the United States. Moreover, this court takes judicial notice of the fact that no litigation challenging the constitutionality of a Good Friday holiday is presently pending before the Hawaii courts. Thus *Pullman* abstention is inappropriate in the instant case; application of federal and Hawaii law is likely to yield the same result in the adjudication of the issues presented in this case.

Another argument proffered in support of the defendants' motion to abstain is that Hawaii Rev.Stat. § 8–1 has been preempted by the collective bargaining agreements which are in effect between public employees and their employers. This argument is premised on Hawaii Rev.Stat. § 89–19 which provides, in pertinent part, that Hawaii statutes pertaining to collective bargaining "shall take precedence over all conflicting statutes concerning this subject matter and shall preempt all contrary ... legislation ... adopted by the State." This court finds that Hawaii Rev.Stat. § 8–1, which establishes Good Friday as a legal holiday, is in no way conflicting with Hawaii's collective bargaining statutes. Chapter 89 of the Hawaii Revised Statutes, wherein are found the collective bargaining statutes, does not mandate that Good Friday be included in all collective bargaining agreements as a paid leave day. The inclusion of this holiday into the collective bargaining agreements is a matter of contract and not a matter of legislation. Furthermore, the argument that the inclusion of a Good Friday holiday into the collective bargaining agreements of approximately 65% of Hawaii's public employees suspends the effect of a validly enacted statute of the state strains credulity. Accordingly, Hawaii Rev.Stat. § 8–1 is not preempted.

For the foregoing reasons, this court will decline to abstain from adjudication of this case.

### IV.

### *Constitutionality of Hawaii Rev.Stat. § 8–1*

Having resolved the foregoing issues relating to the suitability of this forum for

the presentation of the plaintiffs' challenge in favor of the plaintiffs, this court proceeds to the substance of the motions. The plaintiffs and the defendants have cross-moved for summary judgment on the issue of whether Hawaii Rev.Stat. § 8–1 violates the Establishment Clause of the United States Constitution and its counterpart in the Hawaii Constitution.

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ. P. 56(c). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit." *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir.1987). If the moving party meets his burden under Fed.R.Civ.P. 56(c), the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56 "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e)

In *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984), the Supreme Court reiterated its unwillingness "to be confined to any single test or criterion in this sensitive area" of First Amendment challenges to legislation. Nevertheless, the *Lynch* opinion indicates that the Supreme Court still usually adheres to the three prong test enunciated in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), in analyzing such challenges. The essential holding of *Lemon* has become a refrain in virtually all federal cases which challenge lesgislative action which is allegedly violative of the First Amendment.

"Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned

from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally the statute must not foster 'an excessive government entanglement with religion.' "

*Id.* at 2111 (citations omitted).

While the *Lemon* opinion set forth the analysis which is to be used in the resolution of Establishment Clause challenges to legislative action, the opinion also cautioned that a complete separation between the state and religious institutions was not contemplated by the drafters of the First Amendment. Thus, the Court wrote that "[o]ur prior holdings do not call for total separation between church and state; total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable." *Id.* at 2112. Accordingly, federal courts have been cautioned not to be overly "reflexive" in resolving Establishment Clause challenges. "In each case, the inquiry calls for line-drawing; no fixed, *per se* rule can be framed ... The Clause erects a 'blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.' " *Lynch v. Donnelly,* 104 S.Ct. at 1362, *citing Lemon,* 91 S.Ct. at 2112. Although the Supreme Court decisions have sometimes stated that the Establishment Clause erects a "wall" between church and state,

> "the metaphor itself is not a wholly accurate description of the practical aspects of the relationship that in fact exists between church and state. No significant segment of our society and no institution within it can exist in a vacuum or in total or absolute isolation from all the other parts, much less from government."

*Lynch,* 104 S.Ct. at 1359.

The indistinct and variable barrier between religion and the state has a history which is as old as the history of the First Amendment itself. Various legislative acts of the First Session of the First Congress in 1789 give substance to the Supreme Court's observation that "[i]t has never been thought either possible or desirable to enforce a regime of total separation ... " *Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 2958, 37 L.Ed.2d 948 (1973). Indeed, on the day after the First Amendment was proposed, "Congress urged President Washington to proclaim 'a day of public thanksgiving and prayer to be observed by acknowledging with grateful hearts the many and signal favours of the Almighty God.' " *Lynch,* 104 S.Ct. at 1360 n. 2, *citing* A. Stokes and L. Pfeffer, *Church and State in the United States* 87 (rev. 1st ed. 1964). President Washington acceded to the Congress's request and proclaimed a "day of thanksgiving to 'offer our prayers and supplications to the Great Lord and Ruler of Nations ... " Every President of the United States, with two exceptions, has issued similar proclamations. For example, President Roosevelt's proclamation of 1944 suggested "a nationwide reading of the Holy Scriptures during the period from Thanksgiving Day to Christmas." *Id.* Furthermore, "[i]n the very week that Congress approved the Establishment Clause as part of the Bill of Rights for submission to the states, it enacted legislation providing for paid Chaplains for the House and Senate." *Lynch,* 104 S.Ct. at 1359.

Accordingly, the inevitability and, indeed, the desirability of the intermingling of this nation's political and spiritual affairs has been long recognized. As the Supreme Court held in *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952), "[w]e are a religious people whose institutions presuppose a Supreme Being." "[R]eligion has been closely identified with our history and government ... The fact that the Founding Fathers believed devotedly that there was a God and that the inalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself." *School District of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 1566, 10 L.Ed.2d 844 (1963). No judicial semantics can alter the fact that the drafters of the First Amendment felt constrained to acknowledge the religious

origins of the nascent country during the First Congress and now "[i]t is far too late in the day to impose a crabbed reading of the [Establishment] Clause on the country." *Lynch*, 104 S.Ct. at 1366. Moreover, the Supreme Court has counseled that special consideration should be given to the First Congress's interpretation of the Establishment Clause in First Amendment jurisprudence:

> "[t]he interpretation of the Establishment Clause by Congress in 1789 takes on special significance in light of the Court's emphasis that the First Congress 'was a Congress whose constitutional decisions have always been regarded, as they should be regarded, as of the greatest weight in the interpretation of that fundamental instrument.'"

*Id.* at 1359–60, *citing Myers v. U.S.*, 272 U.S. 52, 47 S.Ct. 21, 45, 71 L.Ed. 160 (1926).

Although the Supreme Court has stated that Establishment Clause cases must be decided on a somewhat *ad hoc* basis, the Court has not failed to assist the lower federal courts in making these *ad hoc* determinations by spelling out the various prongs of the *Lemon* test. While the *Lemon* opinion gave lower federal courts a skeletal framework with which to analyze an Establishment Clause case, subsequent opinions of the Supreme Court have fleshed out the framework and provided guidance to lower courts in their application of the three-pronged analysis. Thus, it is incumbent upon this court to review recent Establishment Clause cases decided by the Supreme Court before applying *Lemon* in the instant case.

### 1. *The Purpose Prong.*

■ The *Lemon* opinion holds that "the statute must have a secular legislative purpose." 91 S.Ct. at 2111. "In applying the purpose test, it is appropriate to ask 'whether the government's actual purpose is to endorse or disapprove of religion.'" *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 2490, 86 L.Ed.2d 29 (1985). In recent cases, the Supreme Court has made it clear that the legislature's purpose in enacting a statute need not be wholly secular to pass

muster under the Establishment Clause. In *Wallace*, the Supreme Court held that "a statute that is motivated in part by a religious purpose may satisfy the first [prong of the *Lemon* test, but] the First Amendment requires that a statute must be invalidated if it is entirely motivated by a purpose to advance religion." *Id.* Similarly, in *Lynch*, the Supreme Court held that *Lemon* requires that a statute have "*a*" secular purpose to satisfy the purpose prong; the *Lynch* opinion firmly rejects the notion that the purpose of a statute must be "exclusively secular" to be upheld. *Id.*, 104 S.Ct. at 1363 n. 6. Thus, it is clear that a statute which is motivated by both sectarian and secular purposes is not offensive to the Establishment Clause.

The Supreme Court has also given lower federal courts guidance on how to determine the legislative purpose behind a statute in an Establishment Clause case.

> "The plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history, can control the determination of legislative purpose ... Moreover, in determining the legislative purpose of a statute, the court has also considered the historical context of the statute and the specific sequence of events leading to passage of the statute."

*Edwards v. Aguillard*, —— U.S. ——, 107 S.Ct. 2573, 2583, 96 L.Ed.2d 510 (1987).

■ Supreme Court opinions counsel that courts should be deferential to a state's articulation of a secular purpose, if the court feels that the statement of purpose is sincere and not a sham. *Id.* at 2579. At the same time, however, the Supreme Court has stated that "postenactment elucidation of the meaning of a statute [is] of little relevance in determining the intent of the legislative contemporaneous to the passage of the statute." *Id.* at 2584 n. 19. Thus, a court should *not* give deference to arguments which are made during litigation regarding the purpose behind a statute, unless those arguments are supported by legislative statements contemporaneous with the enactment of the statute.

**1532**

### 2. The Effect Prong.

The *Lemon* opinion states that a statute's "principal or primary effect must be one that neither advances nor inhibits religion." 91 S.Ct. at 2111. To a certain extent, a court's inquiries into the purpose and effect prongs may result in overlap, especially if the legislature's intended purpose has been successfully furthered by the challenged statute. Nevertheless, the Supreme Court has cautioned that the two prongs are conceptually distinct. "The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or approve of religion. The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Wallace*, 105 S.Ct. at 2490 n. 42, *citing Lynch*, 104 S.Ct. at 1368 (O'Connor, concurring).

In *Grand Rapids School District v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed. 2d 267 (1985), the Supreme Court set out in general terms the significance of the effects prong of the *Lemon* test.

"[A]n important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the non-adherents as a disapproval, of their individual religious choices ... The question in each case must be whether the effect of the proferred aid is 'direct and substantial' or 'indirect and incidental.' "

*Id.* at 3226, 3229.

The above quotation from *Ball* makes it clear that, as with the purpose prong, a statute may have sectarian effects and still be constitutionally permissible under *Lemon* analysis. First, the Supreme Court has distinguished between statutes which directly advance religion and statutes which allow religious institutions to advance religion, and therefore confer an "incidental" benefit upon religion. "A law is not unconstitutional simply because it *allows* churches to advance religion, which is their purpose. For a law to have forbidden ef-

fects under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its activities and influence." *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos*, 107 S.Ct. 2862, 2869 (1987) (emphasis in the original).

■ Second, even if a statute confers a governmental benefit on some particular sect, the statute may still be upheld if its primary effect is secular in nature. "The Court has made it abundantly clear ... that 'not every law that confers an indirect, remote, or incidental benefit upon [religion] is, for that reason alone constitutionally invalid.' " *Lynch*, 104 S.Ct. at 1364, *citing Nyquist*, 93 S.Ct. at 2965. If, for example, a statute's "effect merely happens to coincide or harmonize with the tenets of some ... religions," the statute does not offend the First Amendment. *Lynch*, 104 S.Ct. at 1364, *citing McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 1113, 6 L.Ed.2d 393 (1961).

The Supreme Court's opinion in *McGowan* is particularly relevant to this court's application of the effects prong of the *Lemon* test to the facts of the instant case. In *McGowan*, the Court scrutinized the constitutionality of Sunday Closing Laws and upheld those laws, writing that

"[t]hroughout this century and longer, both the federal and state governments have oriented their activities very largely toward improvement of the health, safety, recreation, and general well-being of our citizens. Numerous laws affecting public health, safety factors in industry, laws affecting hours and conditions of labor of women and children, week-end diversion at parks and beaches, and cultural activities of various kinds, now point the way toward the good life for all. Sunday Closing Laws, like those before us, have become part and parcel of this great governmental concern wholly apart from their original purposes or connotations. The present purpose and effect of most of them is to provide a uniform day of rest for all citizens; the fact that this day is Sunday, a day of particular significance for the dominant

Christian sects, does not bar the State from achieving its secular goals. To say that the States cannot prescribe Sunday as a day of rest for these purposes solely because centuries ago such laws had their genesis in religion would give a constitutional interpretation of hostility to the public welfare rather than one of mere separation of church and state. 81 S.Ct. at 1115.

■ Thus, in analyzing the constitutionality of a statute under the *Lemon* test, a court may not confine itself to an examination of those of the statute's effects which might advance religion. Rather, it is incumbent upon the court to make a complete review of *all* the effects of the statute. If a statute's primary effect is secular, the statute may be upheld even though the statute may also have sectarian effects. It is the mission of religious institutions to advance religion, and if an otherwise valid statute allows religious institutions to more successfully embark upon this mission, this does not derogate from the constitutionality of the statute.

### 3. *The Entanglement Prong.*

Establishment Clause jurisprudence is perhaps most sparse with respect to the significance of the entanglement prong of the *Lemon* test which counsels against "an excessive government entanglement with religion." *Lemon*, 91 S.Ct. at 2111. The Supreme Court in *Lynch* characterized entanglement as "a question of kind and degree." 104 S.Ct. at 1365.

■ The First Amendment proscribes two basic types of government entanglement. First, courts should be cautious to ensure that there is no significant financial subsidy of religion by government. The nature of the financial entanglement is of critical importance in application of the *Lemon* test. In *Lynch*, the Supreme Court held that in the absence of "a *direct* subsidy *to* church-sponsored schools or colleges, or other religious institutions," a finding of excessive government entanglement is not warranted. 104 S.Ct. at 1365 (emphasis added). Second, courts should be wary of excessive administrative entanglement.

Thus, the *Lynch* opinion echoes the *Lemon* and holds that "comprehensive, discriminating, and continuing state surveillance" of the activities of religious institutions is the type of "excessive entanglement" proscribed by the First Amendment. 104 S.Ct. at 1365, *citing Lemon*, 91 S.Ct. at 2114–15.

### 4. *Application of the Lemon Test.*

Taking into consideration the foregoing outlines of the *Lemon* test, as they have been developed by *Lynch* and other opinions of the Supreme Court, this court is of the opinion that Hawaii Rev.Stat. § 8–1 which establishes Good Friday as a legal holiday in Hawaii *does not* violate the First Amendment of the United States Constitution or Article I, Section 4 of the Hawaii Constitution.

The plaintiffs argue that the legislative history of the statute which establishes Good Friday as a legal holiday leads to the conclusion that the statute was enacted for sectarian purposes. Accordingly, argue the plaintiffs, the statute is constitutionally defective. To prevail on their motion for summary judgment on this theory, the plaintiffs must prove that "there [is] no question that the statute ... was motivated wholly by religious considerations." *Lynch*, 104 S.Ct. at 1362. The plaintiffs have failed to carry this burden.

The plaintiffs' argument is based upon a reading of the House Standing Committee Report which accompanied a proposed bill that would have enacted a statute establishing Good Friday as a legal holiday in 1939. The pertinent portion of the report reads as follows:

"There are now ten legal holidays in the Territory, including Thanksgiving, plus primary and general election days. Public sentiment is divided on the advisability of creating Good Friday as a legal holiday. Some feel that we already have too many holidays to the detriment of both private and public business. On the other hand, others feel equally strongly that Good Friday being in theory at least a day of solemn religious observance by the members of the various churches and religious denominations should be given

legal sanction. More and more churches are now conducting the three-hour service on that day and many business houses are allowing their employees to take time off for this purpose. If the legislature should feel that we should have more legal holidays than we now have, it would seem that in view of the religious significance of Good Friday observance of this day would have as much justification as Thanksgiving or Christmas."

Haw.H.Stand.Comm.Rep. No. 254–39, *reprinted in* 1939 Haw.H.J. 890. Although the 1939 bill was not passed, the legislative history of that bill is relevant to the history of the 1941 bill which did enact Good Friday as a legal holiday. *See Edwards v. Aguillard,* 107 S.Ct. at 2583 (historical context of the statute and the specific sequence of events leading to the passage of the statute are relevant in determining purpose under a *Lemon* analysis).

A fair reading of the committee report which accompanied the 1939 bill leads to the conclusion that the primary purpose behind the bill was to ensure that legal holidays in the Territory of Hawaii fell with greater frequency. Indeed, perhaps the most important sentence of the pertinent paragraph, that sentence which recommends the establishment of Good Friday as a holiday, begins with the phrase "[i]f the legislature should feel that we should have more legal holidays than we now have. . . ." The import of the phrase could hardly be clearer: legislative debate on the bill enacting Good Friday as a legal holiday was prompted by the legislature's view that the Territory needed "more" holidays. This conclusion is further buttressed by an examination of a schedule of Hawaii's legal holidays as they existed before the enactment of the statute which established Good Friday as a legal holiday:

| Month | # of Holidays |
| --- | --- |
| January | 1 |
| February | 1 |
| March | 0 |
| April | 0 |
| May | 1 |
| June | 1 |
| July | 1 |
| August | 0 |

| Month | # of Holidays |
| --- | --- |
| September | 2 |
| October | 0 |
| November | 1 |
| December | 1 |

Revised Laws of Hawaii § 1–21 (1935). As indicated above, there was a three month period which fell between Washington's Birthday in February and Memorial Day at the end of May during which there were no legal holidays. The establishment of a Good Friday holiday provided for an additional legal holiday during the calendar year's longest "holiday-free" period.

The Senate Standing Committee report which accompanied the 1941 bill which eventually established Good Friday as a legal holiday sheds further light on the legislature's primary purpose in enacting the antecedent of Hawaii Rev.Stat. § 8–1 and bears out the conclusion that that purpose was secular in character. The 1941 bill proposed that both Lincoln's Birthday and Good Friday be designated as legal holidays. The report which accompanied the bill states that

"[y]our committee feels that Good Friday should be set aside as a legal holiday but feels that, inasmuch as Washington's Birthday is a legal holiday and falls within the the short month of February, to have another holiday within that month would be inadvisable."

Haw. Sen.Stand.Comm.Rep. No. 296–41, *reprinted in* 1941 Haw. Sen. J. 710. This language makes the legislature's primary concern regarding the number and frequency of legal holidays apparent. The report on the bill noted that there was not a need for an additional legal holiday in February because of the temporal proximity ·of Washington's Birthday which was already a legal holiday; the report, however, did advocate the establishment of Good Friday as a legal holiday, presumably because no legal holidays fell during early to mid-Spring.

This case is clearly distinguishable from cases such as *Mandel v. Hodges,* 54 Cal. App.3d 596, 127 Cal.Rptr. 244 (1976). In *Mandel,* a California appellate panel scrutinized the constitutionality of an annual executive proclamation declaring a three hour

period on the afternoon of Good Friday to be a paid holiday for state employees. The court noted that a personnel manual distributed to state employees declared that "inasmuch as state office are closed from 12:00 to 3:00 p.m. on Good Friday, employees are given these hours off for worship." *Id.* at 254. Based upon such an express avowal of religious motivation, the court held that the Good Friday holiday "wholly lacks any 'secular purpose.'" Accordingly, the court found that the holiday violated the First Amendment of the United States Constitution. In the instant case, the expressed purpose of the statute is *not* religious; rather, the purpose of the Good Friday holiday, as noted above, is to give Hawaii's workers a day off as a rest from their daily affairs. Furthermore, the secular nature of Hawaii's Good Friday holiday is evidenced by the fact that the *entire* day, rather than a three hour period which corresponds in length to the traditional religious service, is a legal holiday.

■ Thus, there is no doubt that the legislature had "a clearly secular purpose" in mind when it enacted the antecedent of Hawaii Rev. Stat. § 8–1. The fact that the legislature was able to coordinate this secular purpose with a religious purpose is not fatal to the statute. Even if this court assumes that the legislature did enact the Good Friday statute with sectarian purposes in mind, to allow the religious to worship on Good Friday and to allow churches to call the faithful to prayer, the existence of these sectarian purposes would not constitutionally flaw the statute. As indicated above in this order, the Supreme Court only requires that a statute have "a" clearly secular purpose to meet the requirements of the *Lemon* test. *Lynch*, 104 S.Ct. at 1363 n. 6.

Therefore, an examination of the 1939 report leads this court to conclude that the Good Friday holiday was primarily proposed to increase the frequency of legal holidays. It is also noteworthy to point out, as does the State in this case, that the legislative report seems to acknowledge that Good Friday is not an entirely religious day. The 1939 report characterizes Good Friday as "in theory at least a day of solemn religious observances," apparently reflecting the legislature's sentiment that Good Friday had lost much of its religious nature and had become a holiday similar in nature to Thanksgiving or Christmas which have been secularized to some extent over the centuries. Indeed, this court is also of the opinion that Good Friday has attained a secular character; for the majority of Americans Good Friday has become more an integral part of a traditional three day secular celebration of Spring which begins on Good Friday and continues through Easter Sunday than a solemn observance of Jesus Christ's crucifixion.

This court concludes that the secular purpose behind the establishment of the Good Friday is manifest. The legislature does not offend the First Amendment by enacting a statute intended to ensure that the people of Hawaii have an adequate number of leave days. This court further concludes that any ancillary sectarian purpose which the legislature may have had in establishing Good Friday as a holiday is not fatal to the Hawaii Rev. Stat. § 8–1, since "a clearly secular purpose" for the statute exists and since Good Friday, like Christmas, has become secularized to some extent over the centuries.

■ An examination of the effects of Hawaii Rev. Stat. § 8–1 leads this court to the conclusion that the legislature's intended purpose in declaring Good Friday to be a legal holiday has been fulfilled. While the plaintiffs argue that the effect of the Good Friday statute is to give Christian sects the imprimatur of State approval, an analysis of the effects of the statute compels this court to find that the secular effects of the statute significantly predominate over the sectarian effects of the statute.

The defendants have submitted the affidavits of Robert Robinson and Lex Brodie in support of their motion for summary judgment. Mr. Robinson is the President and the Chief Executive Officer of the Chamber of Commerce of Hawaii and Mr. Brodie is the President and Owner of National Tire of Hawaii, Ltd. The affidavits support the finding that Good Friday has

become a traditional shopping day in Hawaii. Both affidavits state that sales volumes increase on Good Friday, and that the increase in sales volume is almost certainly attributable to the fact that the day is a paid leave day for many workers in the state. The defendants have also submitted a letter from Hiram Kamaka, Director of the City and County of Honolulu's Department of Parks and Recreation. This letter establishes the fact that applications for camping permits on the island of Oahu more than double on the long weekend which includes Good Friday. This letter leads to the inference that Hawaii's population is better poised to take advantage of the state's unique recreational opportunities because of the enactment of the Good Friday statute which creates a "three-day weekend" for many Hawaiians. The salutary effect of increasing the quality of life of workers through the advancement of recreational opportunities was expressly sanctioned by the Supreme Court in *McGowan, supra.*, even though the Sunday Closing Laws which were under scrutiny in that case had an incidental religious effect.

Since *Lynch*, it has been well settled that statutes which confer an "indirect, remote, or incidental" benefit upon religion are not offensive to the First Amendment. Furthermore, the opinion of the Supreme Court in *Amos*, quoted above, is particularly apt here and merits reiteration: "[a] law is not unconstitutional simply because it *allows* churches to advance religion, which is their purpose. For a law to have forbidden effects under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its activities and influence." 107 S.Ct. at 2869. Supreme Court opinions further hold that government's secular celebration of traditional religious holidays is not a constitutionally impermissible "effect." "Government celebration of [Christmas], which is extremely common, generally is not understood to endorse the religious content of the holiday, just as government celebration of Thanksgiving is not so understood." *Lynch*, 104 S.Ct. at 1369 (O'Connor, concurring).

In the instant case, there is simply no evidence that the enactment of Hawaii Rev. Stat. § 8-1 has advanced Christianity. The affidavits of the plaintiffs which were attached to the memorandum in support of their motion do not indicate that the inconveniences which have been occasioned by the Good Friday statute are any different in degree or kind that those inconveniences which accompany every legal holiday in the state.

The deposition testimony of the various plaintiffs also supports this court's conclusion that the effects of the Good Friday holiday are no different from the effects of any legal holiday of a more patently secular character. Plaintiff Root testified that although various University of Hawaii libraries were closed on Good Friday and that although he did not have secretarial services on that day, he was able to attend to his research in his University of Hawaii laboratory. (Root deposition, p. 49.) Plaintiff Root further testified he does not feel that the establishment of the Good Friday holiday discriminates against his adherence to his own religious beliefs. (Root deposition, p. 55.) Plaintiff Cammack testified that the Good Friday has not prevented her from fulfilling her professional obligations. (Cammack deposition, p. 30.) Plaintiff Cammack takes advantage of the Good Friday holiday by visiting with family, shopping, travelling, and resting. (Cammack deposition, pp. 47, 50, 68–69.) Plaintiff Wallace testified that on Good Friday she was able to study in the classrooms at the University of Hawaii, where she was a law student, even though the day is a legal holiday. (Wallace deposition, pp. 39–40.) She also testified that she will have access to the Hawaii Supreme Court's law library on Good Friday when she will serve as a law clerk to a justice on that court. (Wallace deposition, p. 23.) Apparently, the only inconveniences suffered by plaintiff Wallace on Good Friday resulted from the curtailment of various services at public libraries and the reduced holiday schedule of the public bus lines. (Wallace deposition, p. 26.) The reduction in public library services and the closure of a public office building are the only tangible injuries to

which Plaintiff Stapleton testified. (Stapleton deposition, pp. 25, 32.) Significantly, plaintiffs Root, Cammack, and Wallace testified that they did not notice any display of religious symbology which they can attribute to the establishment of a Good Friday holiday. (Root deposition, pp. 56, 91; Cammack deposition, pp. 40–42; Wallace deposition, pp. 40–50.) Public employers do not coerce their employees into attending church on Good Friday and the day is a paid leave day for all employees, regardless of their individual religious choices. The fact that the enactment of the statute may facilitate larger congregations at Good Friday services does not enter into this court's calculus; as noted above, churches are charged with a special mission and if legislative action has the incidental benefit of allowing them to pursue that mission more successfully, such an incidental benefit is in no way offensive to the First Amendment.

The important point here is that days which are religiously significant for one sect may mean different things to different people. A day which is a "holy day" for a Christian may be a "holiday" for a Jew, or a Buddhist, or a Baha'i, or an atheist. While Jews, Buddhists, Baha'is, and atheists may celebrate the advent of Spring on the long weekend which begins with Good Friday by hunting for gaily colored eggs in their gardens, delivering baskets of candies and flowers to family and friends, and other secular activities, Christians may commemorate the death and resurrection of Jesus Christ. Each person is free to emphasize those aspects of the holiday, the secular or the sectarian, which he or she chooses to emphasize, just as each individual is free to focus on the secular or the sectarian facets of our traditional Thanksgiving and Christmas holidays. In *Lynch*, the Court found that federal employees are released from their duties on Thanksgiving and on Christmas, to spend those days as they so choose. *Id.* at 1360–61. Similarly, this court finds that Hawaii's employees may spend Good Friday as they so choose.

Thus, this court acknowledges that the establishment of Good Friday as a legal holiday may have effects which coincide or harmonize with the religious tenets of Christianity, and which incidentally benefit Christians and their churches. Supreme Court "precedents plainly contemplate that on occasion some advancement of religion will result from governmental action." *Lynch*, 104 S.Ct. at 1364. *Lynch* teaches that such effects are not proscribed by the First Amendment when the primary effect, and, indeed, the intended effect, of the statute is secular. 104 S.Ct. at 1364. It would stand the First Amendment on its head to hold that any secularly motivated statute, which successfully achieved its secular purpose, must be stricken as violative of the First Amendment if the statute also allows a segment of the population to comply with their religious obligations. As the *Lynch* opinion states, the First Amendment "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility towards any." *Lynch*, 104 S.Ct. at 1359.

This court concludes that the primary effect of the Good Friday statute is secular in nature. Specifically, the court finds that the citizens of Hawaii are afforded a needed day off from work on that day; whether the people of Hawaii choose to spend the day at the beach or in their churches is an individual choice which is in no way influenced by the state. Since the primary effect of the holiday is secular, Hawaii Rev. Stat. § 8–1 passes muster under the effect prong of the *Lemon* test.

The plaintiffs' argument that the enactment of a Good Friday holiday has resulted in excessive government entanglement with religion is two-pronged. First, the plaintiffs make an argument raising the spectre of administrative entanglement; they argue that the enactment of Hawaii Rev. Stat. § 8–1 has been politically divisive because religious sects other than the Christian sects have attempted, and failed, to have significant holy days in their calendar declared legal holidays by the state legislature. For example, the plaintiffs refer this court to the Hawaii legislature's refusal to declare Buddha Day and Baha'i New Year's Day as legal holidays. This court is unpersuaded by this argument of the plaintiffs. While the Hawaii legisla-

ture has refused to declare these days as public holidays, a Hawaii statute states that April 8 of each year "shall be known and designated as 'Buddha Day'" and that March 21 "shall be known as Baha'i New Year's Day." Hawaii Rev. Stat. § 8–4. More importantly, any evidence that Buddhists or Baha'is have been motivated to seek holiday status for their respective holy days by the existence of the Good Friday holiday is conspicuously absent from the plaintiffs' argument. The attempts by these religious sects to have their respective holy days established as legal holidays were made approximately 30 years after the antecedent of Hawaii Rev. Stat. § 8–1 was enacted. Whether the existence of Christmas as a legal holiday in Hawaii, the existence of Good Friday as a legal holiday, or some other motivation unrelated to the current roster of holidays was the initial impetus behind the lobbying efforts to have religious days declared as legal holidays is simply unclear. In the absence of a causal link between the efforts of some religious sects to have certain days declared legal holidays and the establishment of Good Friday as a legal holiday in Hawaii, and in the absence of any evidence of acrimony between the religious sects of this state, this court cannot conclude that Hawaii Rev. Stat. § 8–1 has been divisive. Furthermore just as in *Lynch*, "[t]his case does not involve a direct subsidy to ... religious institutions, and hence no inquiry into political divisiveness is even called for." 104 S.Ct. at 1365.

■ Second, the plaintiffs argue that Hawaii Rev. Stat. § 8–1 results in entanglement because the date of Good Friday is determined each year by reference to an "ecclesiastical" calendar. (At the oral argument on these motions, the plaintiffs' attorney conceded that this entanglement argument is a "weak" argument.) First, this court notes that while Good Friday may be on an "ecclesiastical" calendar, its date in fact is determined by reference to a lunar calendar which exists independently of any religious scripture. Second, the intrusion of religion into government caused by the designation of a "floating" holiday's date by reference to a lunar calendar, if

any, is *de minimis* and certainly not the "comprehensive" and "continuing" entanglement which the First Amendment was designed to prevent. *Lynch*, 104 S.Ct. at 1365. This court is not persuaded by, and is in no way bound by, the opinion in *Griswold Inn, Inc. v. Connecticut*, 183 Conn. 552, 441 A.2d 16, 22 (1981), in which the court found without any explanation that the reference to an "ecclesiastical" calendar contributed to a finding of entanglement of government with religion. Thus, this court concludes that the Good Friday holiday has not led to excessive entanglement between the state and religion.

The foregoing analysis indicates that the Good Friday holiday was enacted for a secular purpose, has a primarily secular effect, and does not result in excessive entanglement. Accordingly, this court concludes that Hawaii Rev. Stat. § 8–1 is compatible with the requirements of the Constitution as set out in the *Lemon* test.

### 5. The Similarity of Thanksgiving, Christmas, and Good Friday.

This court has concluded above that the establishment of Good Friday as a legal holiday by Hawaii's legislature is permissible under the *Lemon* test. This conclusion is buttressed by this court's further finding that Good Friday shares characteristics with Thanksgiving and Christmas which render the Good Friday holiday constitutionally permissible under *Lynch*. In *Lynch*, the Supreme Court found that Thanksgiving was traditionally "celebrated as a religious holiday" and that "[t]hat holiday has not lost its theme of expressing thanks for Divine aid any more than has Christmas lost its religious significance." *Id.* at 1360. Having found that Thanksgiving and Christmas were days of "religious significance," the Court went on to find that the traditional public holidays falling on those days were not offensive to the First Amendment. *Id.* at 1360–61, 1378–79 (Brennan, dissenting). As noted above by the Court in *Lynch*, "the Government has long recognized—indeed it has subsidized—holidays with religious significance." *Lynch*, 104 S.Ct. at 1361.

Language from Justice Brennan's dissenting opinion in *Lynch* is illuminating with respect to government's ability to recognize the sanctity of a religious day within the boundaries prescribed by the First Amendment. Justice Brennan wrote that "although the government may not be compelled to do so by the Free Exercise Clause, it may, consistently with the Establishment Clause, act to accommodate to some extent the opportunities of individuals to practice their religion ... [G]overnment does not violate the Establishment Clause when it simply chooses to 'close its doors or suspend its operations as to those who want to repair to their religious sanctuary for worship or instruction.' "

*Lynch* 104 S.Ct. at 1381 (Brennan, dissenting), *citing Schempp*, 83 S.Ct. at 1610–12 (Brennan, concurring), *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952). Justice Brennan went on to opine that the foregoing principle justified "government's decision to declare December 25th a public holiday." *Id.*

■■■■ The similarity in the characters of Thanksgiving, Christmas, and Good Friday is clear. All three holidays are intertwined with the history of our nation. Indeed, Christmas and Good Friday have histories of their own which far exceed in their scope the history of this country; the two days mark the birth and death of Jesus Christ and have been observed for centuries. As this court has noted above, Good Friday, while religious in its origins, has, like Christmas, attained a partially secular character revolving around traditional Spring celebrations. Thus, this court concludes that Good Friday and Christmas stand on equal footing before the First Amendment. Christmas celebrates the birth of Christ, whereas Good Friday commemorates Christ's crucifixion. Both Christmas and Good Friday have been traditionally celebrated and acknowledged as religious holy days by the Western world for many centuries. The partial secularization of the two holidays is somewhat parallel in that the days have come to signify the advent of seasonal commercial sales, an opportunity to relax with family, and the occasion to engage in traditional seasonal celebrations. Justice Brennan wrote that "[w]hen government decides to recognize Christmas Day as a public holiday, it does no more than accommodate the calendar of public activities to the plain fact that many Americans will expect on that day to spend time visiting with their families, attending religious services, and perhaps enjoying some respite from preholiday activities. The Free Exercise Clause, of course, does not necessarily compel the government to provide this accommodation, but neither is the Establishment Clause offended by such a step. *Lynch*, 104 S.Ct. at 1379 (Brennan, dissenting). What Justice Brennan wrote about Christmas appears to this court to apply with equal force to Good Friday. Each holiday provides Americans with a day off from work and neither holiday calls for the state's administrative involvement in or supervision of the church's affairs.

Thus, the obvious similarities which exist between Thanksgiving, Christmas, and Good Friday insulate the Good Friday holiday from a successful First Amendment challenge. The Supreme Court's holding that Thanksgiving and Christmas, while religiously significant, are nevertheless constitutionally inoffensive as public holidays, mandates that this court similarly find that the Good Friday holiday is constitutionally permissible. The *McGowan* decision counsels that traditional public holidays which are also religiously significant days may, through the passage of time, partially lose their sectarian nature and become constitutionally permissible, regardless of legislative intent in establishing those holidays. Good Friday in Hawaii, whatever its intended purpose, has become a traditional and uniform day of rest and relaxation for the citizens of the State. Accordingly, the holiday does not offend either the United States Constitution or the Hawaii Constitution.

## V.

### *Conclusion*

To summarize, this court finds that the primary purpose of the statute which es-

**1540**

tablished Good Friday as a legal holiday was to increase the number and frequency of legal holidays in the Territory. This purpose is clearly secular. The court also finds that the primary effect of the statute is secular. The Good Friday holiday allows the people of Hawaii to play or to pray as they see fit. Even the plaintiffs concede that many more people can be found in Hawaii's parks and shopping malls on Good Friday than can be found in its churches. Finally, this court finds that the enactment of the antecedent to Hawaii Rev. Stat. § 8–1 has not led to excessive entanglement between religion and the state.

Moreover, this court's finding that Good Friday is similar in nature to Thanksgiving and Christmas provides additional ground for insulating the Good Friday holiday from a successful constitutional challenge. Just as Christmas and Thanksgiving are permissible because of their partially secular observations and because they provide a uniform day of rest and relaxation for Americans, Good Friday has attained a secular position in this nation's traditional fabric and provides citizens of Hawaii with a uniform day of rest.

For the foregoing reasons, the plaintiffs' motion for partial summary judgment with respect to the constitutionality of Hawaii Rev. Stat. § 8–1 is denied, and the defendants' motion for summary judgment with respect to the constitutionality of Hawaii Rev. Stat. § 8–1 is granted. The statutory establishment of Good Friday as a legal holiday offends neither the United States nor the Hawaii Constitutions.

Having concluded that Hawaii Rev. Stat. § 8–1 is constitutionally permissible, this court finds no basis to conclude that the collective bargaining agreements between public employees and their employers which establish Good Friday as a paid leave day, either expressly or through incorporation of Hawaii Rev. Stat. § 8–1, are in any way violative of the United States or Hawaii Constitutions. Accordingly, the plaintiffs' motion for partial summary judgment with respect to the constitutionality of the collective bargaining agreements is denied, and the defendants' motion for

summary judgment with respect to the collective bargaining agreements is granted.

SO ORDERED.