927 P.2d 386

STATE OF HAWAI'I ORGANIZATION OF POLICE OFFICERS (SHOPO), Plaintiff–Appellee,

and

Doe Police Officers 1 through 4, Plaintiffs–Intervenors–Appellants,

v.

SOCIETY OF PROFESSIONAL JOURNALISTS–UNIVERSITY OF HAWAI'I CHAPTER, a non-profit organization, Defendants–Appellees,

and

City and County of Honolulu, Honolulu Police Department, and Michael Nakamura, in his capacity as Chief of the Honolulu Police Department, Defendants–Appellants,

and

Liberty [Newspapers Limited] Partnership dba The Honolulu Star–Bulletin, an Arkansas limited partnership; Gannett Pacific Corporation dba The Honolulu Advertiser, a Delaware corporation; Burnham Broadcasting Co. dba KHON–TV2, a Delaware corporation; TAK Communications, Inc. dba KITV, a Maryland corporation; and Lee Enterprises, Inc. dba KGMB–TV9, an Iowa corporation, Defendants–Intervenors,

and

State of Hawai'i, Office of Information Practices, Defendant–Intervenor (Civ. No. 94–0547);

and

SOCIETY OF PROFESSIONAL JOURNALISTS–UNIVERSITY OF HAWAI'I CHAPTER, a non-profit organization, Plaintiff–Appellee,

v.

CITY AND COUNTY OF HONOLULU, Honolulu Police Department, and Michael Nakamura, in his capacity as Chief of the Honolulu Police Depart-

ment, Defendants–Appellants (Civ. No. 94–0657).

No. 19583.

Supreme Court of Hawai'i.

Nov. 15, 1996.

Michael J. Green (David J. Gierlach with him on the briefs), Honolulu, for SHOPO.

Michael A. Lilly of Ning, Lilly & Jones, Honolulu, for Doe Officers 1 through 4.

Jeffrey S. Portnoy (Christopher I. L. Parsons with him on the briefs of Cades, Schutte, Fleming & Wright), Honolulu, for SPJ.

Debra A. Kagawa (former Deputy Corporation Counsel Daniel J. Kunkel on the briefs), Honolulu, for the City.

Moya T. Davenport Gray (Hugh R. Jones with her on the briefs), Honolulu, for OIP.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

These consolidated appeals[1] all arise from the Society for Professional Journalists–University of Hawai'i Chapter (SPJ's) attempt, pursuant to Hawai'i Revised Statutes (HRS) Chapter 92F, to obtain records of disciplinary actions taken against employees of the Honolulu Police Department (HPD). The State of Hawai'i Organization of Police Officers (SHOPO) and plaintiffs-intervenors Doe Police Officers 1 through 4 (Doe Officers) brought an action for declaratory and injunctive relief against the City and County of Honolulu, the HPD, and HPD Chief Michael Nakamura [hereinafter, collectively, the City], seeking to enjoin the release of the information sought by SPJ [hereinafter, the SHOPO case]. SPJ and the State of Hawai'i Office of Information Practices (OIP) intervened as defendants in the SHOPO case. SPJ then filed a separate action against the same City defendants, requesting that the circuit court order the City to produce government records responsive to SPJ's requests [hereinafter, the SPJ case].

In Supreme Court No. 18867, the City appeals from the circuit court's order, in the SPJ case, granting summary judgment to SPJ and ordering the release of the records sought in SPJ's August 30, 1993 request for information. On appeal, the City contends that summary judgment was erroneously granted and that the City was not required by law to disclose the disciplinary records because: (1) the circuit court erroneously applied the 1993 amendment to HRS § 92F–14(b)(4) retroactively, and/or the suit was rendered moot by the 1995 amendment of that section; (2) it was impossible and/or unduly burdensome to comply with SPJ's request; and (3) HRS § 92F–14(b)(4) effects an unconstitutional invasion of police officers' rights to privacy.

SHOPO and the Doe Officers, in Supreme Court Nos. 19558 and 19571, respectively, appeal the circuit court's ruling, in the SHOPO case, that they are collaterally estopped from relitigating issues decided in the SPJ case. On appeal, SHOPO and the Doe Officers contend that, because they were not parties or in privity with parties in the SPJ case, collateral estoppel does not preclude them from relitigating the constitutionality of HRS § 92F–14(b)(4).

In Supreme Court No. 19583, OIP and SPJ appeal the circuit court's order denying OIP's motion for summary judgment, in which SPJ and the City joined, in the SHOPO case. On appeal, OIP and SPJ maintain that the court erred when it ruled that, under HRS Chapter 89, the provisions of the collective bargaining agreement (CBA) between SHOPO and the City supersede the disclosure provisions of HRS Chapter 92F. OIP and SPJ contend that, therefore, the confidentiality provision of the CBA, although disputed, does not raise a genuine issue of material fact and that they are entitled to judgment as a matter of law.

For the reasons stated below, we affirm in part and vacate in part the order granting SPJ's motion for summary judgment in the

---

1. The appeals in Supreme Court Nos. 19558, 19571, and 19583 were consolidated under No. 19583 by order filed March 22, 1996; the appeal in Supreme Court No. 18867 was consolidated under No. 19583 by order filed July 23, 1996.

SPJ case. We remand with instructions to the circuit court to enter an order modifying its earlier order by requiring the City to provide access to all records responsive to SPJ's October 28, 1993 request. We vacate the circuit court's order in the SHOPO case, granting in part and denying in part OIP's motion for summary judgment, and remand for entry of an order granting OIP's motion for summary judgment. On remand, SHOPO and the Doe Officers may relitigate the constitutionality of HRS § 92F–14(b)(4), recognizing, however, that the circuit court is bound by our decision on the merits rendered herein.

## I. BACKGROUND

### A. The Uniform Information Practices Act (Modified)

By enacting Hawai'i's Uniform Information Practices Act (Modified) (UIPA), codified at HRS Chapter 92F, the legislature sought to "provide[ ] a new framework for the resolution of the often competing public and privacy interests involved in terms of access to government records[,]" starting from the "shared view [of both the House and the Senate] that an open government is the cornerstone of our democracy." Conf. Comm. Rep. No. 112–88, in 1988 House Journal, at 817. The purpose of the UIPA is to "provide clear recognition of both its primary goal of ensuring access to government records and the constitutional right of privacy which must clearly be considered in every appropriate case." Id. HRS § 92F–2 (Supp.1992) describes these purposes and policies:

> Purposes; rules of construction. In a democracy, the people are vested with the ultimate decision making power. Government agencies exist to aid the people in the formation and conduct of public policy. Opening up the government processes to public scrutiny and participation is the only viable and reasonable method of protecting the public's interest. Therefore the legislature declares that it is the policy of this State that the formation and conduct of public policy—the discussions, deliberations, decisions, and action of government agencies—shall be conducted as openly as possible.

> The policy of conducting government business as openly as possible must be tempered by a recognition of the right of the people to privacy, as embodied in section 6 and section 7 of Article I of the Constitution of the State of Hawaii.

> This chapter shall be applied and construed to promote its underlying purposes and policies, which are to:
> (1) Promote the public interest in disclosure;
> (2) Provide for accurate, relevant, timely, and complete government records;
> (3) Enhance governmental accountability through a general policy of access to government records;
> (4) Make government accountable to individuals in the collection, use, and dissemination of information relating to them; and
> (5) Balance the individual privacy interest and the public access interest, allowing access unless it would constitute a clearly unwarranted invasion of personal privacy.

The UIPA imposes "[a]ffirmative agency disclosure responsibilities" and establishes the general rule that "[a]ll government records are open to public inspection unless access is restricted or closed by law." HRS § 92F–11 (Supp.1992). There are five exceptions to this general rule enumerated in HRS § 92F–13. The instant case requires application of HRS § 92F–13(1), excepting from the general disclosure requirement "[g]overnment records which, if disclosed, would constitute a clearly unwarranted invasion of personal privacy[.]" The conference committee's explanation of this provision, which it "intended to serve as a clear legislative expression of intent should any dispute arise as to the meaning of these provisions[,]" is that, "[o]nce a significant privacy interest is found, the privacy interest will be balanced against the public interest in disclosure. If the privacy interest is not 'significant,' a scintilla of public interest in disclosure will preclude a finding of a clearly unwarranted invasion of

personal privacy." Conf. Comm. Rep. No. 112–88, in 1988 House Journal, at 817–18.

Examples of information in which an individual has a "significant privacy interest" are enumerated in HRS § 92F–14(b). The crux of the instant appeals is HRS § 92F–14(b)(4) (Supp.1992) and its subsequent amendments. On July 1, 1989, the effective date of the UIPA, HRS § 92F–14(b)(4) provided in relevant part that an individual has a significant privacy interest in "[i]nformation in an agency's personnel file, ... *except information relating to the status of any formal charges against the employee and disciplinary action taken* [.]" *Id.* (emphasis added).

In order "to clarify what individually identifying information about employees may be disclosed upon request, and at what stage of the disciplinary process such disclosure may occur," Sen. Stand. Comm. Rep. No. 273, in 1993 Senate Journal, at 916, the legislature adopted Act 191, which amended HRS § 92F–14(b)(4) to specify that an individual does not have a significant privacy interest in:

The following information related to employment misconduct that results in an employee's suspension or discharge:

(i) The name of the employee;

(ii) The nature of the employment related misconduct;

(iii) The agency's summary of the allegations of misconduct;

(iv) Findings of fact and conclusions of law; and

(v) The disciplinary action taken by the agency[ ] when the following has occurred: the highest non-judicial grievance adjustment procedure timely invoked by the employee or the employee's representative has concluded; a written decision sustaining the suspension or discharge has been issued after this procedure; and thirty calendar days have elapsed following the issuance of the decision; provided that this subparagraph shall not apply to a county police department officer with respect to misconduct that occurs while the officer is

not acting in the capacity of a police officer[.]

1993 Haw. Sess. L. Act 191, § 1 at 290, codified at HRS § 92F–14(b)(4)(B) (1993).

In 1995, the legislature amended HRS § 92F–14(b)(4) yet again, by deleting the phrase "with respect to misconduct that occurs while the officer is not acting in the capacity of a police officer" and adding the phrase "except in a case which results in the discharge of the officer." 1995 Haw. Sess. L. Act 242, § 1 at 641–42. Act 242 became law on July 6, 1995, without the Governor's signature. *Id.* at 643.

### B. *Factual and Procedural History*

On August 30, 1993, SPJ wrote to Chief Nakamura, requesting the following information:

The names and titles of all Honolulu Police Department employees who, from January 1, 1988 to current, were either suspended or discharged as a result of disciplinary action sustained against them. We would also like to receive information that explains the nature of the employment-related misconduct, your department's summary of the allegations of misconduct, any findings of fact and conclusions of law, and the type of disciplinary action taken by your department.

The letter made clear that the request was made "[p]ursuant to the provisions of Chapter 92F, Hawaii Revised Statutes, as amended by Act 191, Session Laws of Hawaii 1993." The HPD's response, signed by Chief Nakamura and dated September 7, 1993, stated:

The information you have requested is not name specific and is not presently contained in a record that is readily retrievable. The department does not maintain records that show disciplinary records of employees by suspensions or discharges. Neither is there a record that indicates the status of grievances for suspensions or terminations.

Therefore, there is no means to provide you with the requested information outside of a manual search of all personnel records to compile and collate the information that you request. As you know, an agency is

not required to create a roster or to summarize and compile records unless that information is readily retrievable in the form requested. We are willing to provide you with the information *if you are willing to pay for the time necessary for our personnel to complete the search, compilation and collection.* If you so desire, we will provide you with a hourly cost and the approximate cost of the search for the information you requested.

Since our records are by employee names, we would be able to provide you with the type of information you request on a specific individual if you provide us with the specific name of the employee of this department. A reasonable research fee will be charged pursuant to the draft rules of the Office of Information Practices.

(Emphasis added).

In a follow-up telephone conversation, HPD's legal counsel, Timothy Liu, advised SPJ's then-President, Jahan Byrne, that SPJ's request for information would cost approximately $20,000. Liu told Byrne that HPD did not have an employee available to do the required research and might have to hire someone or pay an employee overtime to search its personnel files for the information. Liu refused to specify a date by which the HPD might be able to fulfill SPJ's request for information. In early October 1993, Byrne again telephoned Liu and questioned HPD's demand for fees amounting to approximately $20,000 to search, segregate, and copy pertinent records in order to respond to SPJ's request. Liu reiterated the position taken in Chief Nakamura's September 7, 1993 letter—that HPD was entitled to request such fees based on draft rules that had been circulated to the HPD by the OIP.

By letter dated October 28, 1993, SPJ informed Chief Nakamura that:

In order to expedite your response to our request, we are hereby amending our request for information regarding the suspension and dismissal of just police officers, rather than of all HPD employees. We are also reducing the period of time—from January 1, 1991 rather than from January 1, 1988—that we would like this information compiled.

. . . .

Further, prior to providing this information to us, we would like a cost estimate from you that is not based on OIP's draft rules for research time and copying charges. OIP's draft rules are exactly that—draft—and your department cannot use them to determine research fees and copying charges. HPD can only use fees established by state law and by its own rules adopted by Hawaii's Administrative Procedures Act (Ch. 91, Hawaii Revised Statutes).

Also on October 28, 1993, SPJ sent a letter to the OIP, notifying the OIP of the HPD's position and requesting that the OIP "review HPD's demand to charge research fees based on OIP's draft rules" and "review government records kept by HPD ... to determine if the information requested [by SPJ] [was] more easily obtained from these records rather than from a search of each and every HPD personnel file."

The OIP responded to SPJ's request by issuing a letter to the HPD dated November 24, 1993. The OIP opined, *inter alia,* that "there is presently no legal authority for an agency to impose fees for the time spent searching, reviewing, and segregating disclosable records" because "the OIP has the exclusive authority to adopt rules concerning the fees that may be charged by State and county agencies for the time spent searching, reviewing, and segregating disclosable records." The OIP's letter also inquired about the scope and location of HPD records that might be responsive to SPJ's request.

By letter dated January 4, 1994, Chief Nakamura responded to the OIP. He summarized that

the fact remains that HPD would have to examine all its personnel records (active and inactive) to determine 1) whether an officer has a disciplinary record, 2) whether that record is within the temporal span requested, 3) whether that event was performed in the capacity of a police officer (this will require an examination of the investigative report which is separate from the individual's personnel record), 4) whether the temporal parameters are met

with respect to grievance procedures, and 5) preparing the report reflecting releasable information.

Chief Nakamura also expressed his frustration that "OIP still has not moved to hold public hearings on its draft rules. The state, therefore, has been without rules for years and without expeditiously moving toward holding hearings on those rules OIP has created an extremely difficult position for agencies to comply with the parameters of the UIPA."

There is no indication in the record that the HPD ever acknowledged or responded to SPJ's October 28, 1993 request. On or about January 12, 1994, Byrne verbally requested of HPD Public Information Officer Jean Motomoya that the HPD expedite SPJ's prior requests by initially providing SPJ, as soon as possible, with the names of HPD officers suspended or discharged since June 9, 1993, the effective date of the amendments to Chapter 92F.

By letter dated February 8, 1994 to Lieutenant Bennie Atkinson, President of SHOPO, the HPD notified SHOPO that:

The Honolulu Police Department has been requested, pursuant to Hawaii Revised Statutes Chapter 92F, to furnish disciplinary information.

We have determined that the four officers' disciplinary records fall within the parameters of the law. We are notifying you and the affected officers that, pending a final check regarding the release of the information under the statute, that [sic] the information will be released to the requesting party no later than on Friday, February 11, 1994.

The SHOPO case was filed on February 10, 1994, wherein SHOPO sought declaratory judgment to the effect that: (1) the provisions of its CBA with the HPD are inviolate, notwithstanding statutory authority to the contrary;[2] (2) HRS Chapter 92F could not be retroactively applied to require disclosure of information regarding events prior to the effective date of the applicable chapter 92F sections; (3) HRS Chapter 92F is unconstitutional and, therefore, void; and (4) HPD may not release the type of information sought by SPJ under HRS Chapter 92F. Together with its complaint, SHOPO filed a motion for a temporary restraining order, prohibiting the City "from releasing any names, data, facts, or information pertinent to members of Hawaii public sector bargaining unit 12 (Police Officers), who have been disciplined by HPD for job related actions[.]" The motion for temporary restraining order was orally granted at a hearing held on February 11, 1994.

Also on February 11, 1994, by letter and fax to Chief Nakamura, SPJ confirmed its January 12, 1994 verbal request to HPD for

the names and titles of HPD officers who, from June 9, 1993 to current, were either suspended or discharged as a result of disciplinary action sustained against them. We would also like to receive information, if readily retrievable, that explains the nature of the employment-related misconduct, your department's summary of the allegations of misconduct, any findings of fact and conclusions of law, and the type of disciplinary action taken by your department.

Chief Nakamura responded by letter dated February 17, 1994, informing SPJ that the HPD "was prepared to release that information on February 11, 1994. However, this department has been temporarily enjoined by the court from any release of the information."

The SPJ case was filed on February 18, 1994, wherein SPJ requested that the court "[o]rder the [City] Defendants to produce all government records responsive to SPJ's requests." By motion filed February 22, 1994,

---

2. At the time SHOPO's complaint was filed, the CBA between SHOPO and the HPD, effective July 1, 1989 through June 30, 1993, did not provide that the names of disciplined police officers be confidential. In 1994, SHOPO and the State and counties amended their CBA, retroactive to July 1, 1993, to include the following provision:

Article 13. Discipline and Dismissal.
. . . .
D. All matters under this article, including investigations, shall be considered confidential.
COMMENTARY
The parties acknowledge that this section may conflict with the provisions of Chapter 92F, HRS, and may be subject to legal challenge.

SPJ also sought leave to intervene in the SHOPO case. SPJ and OIP were granted intervention as defendants in the SHOPO case by orders filed March 14 and 15, 1994, respectively.

On March 3, 1994, SHOPO filed its motion for preliminary injunction. The following day, four police officers, identified only as Doe Police Officers 1 through 4, filed a motion to intervene in the SHOPO case as plaintiffs, alleging that each had received and accepted suspensions of three to five days by the HPD as punishment for violations of the HPD's standards of conduct and that release of their names would cause each of them irreparable damage. The motion to intervene was granted on March 28, 1994.

On March 22, 1994, SPJ filed a motion for summary judgment in the SPJ case. SPJ contended that it was entitled, as a matter of law, to a declaratory judgment ordering the HPD to release to SPJ the records requested by SPJ and to an award of attorneys' fees and costs incurred by SPJ in the SPJ and SHOPO cases.

Following a two-day hearing on SHOPO's motion for preliminary injunction, in which the Doe Officers joined, Judge Lim orally denied the motion on March 30, 1994. Judge Lim found that, while the balance of harms tipped slightly in favor of SHOPO and the Doe Officers, they were unlikely to prevail on the merits of their claims and that the public interest did not support the issuance of the preliminary injunction. SHOPO, joined by the Doe Officers, appealed the ruling.[3]

Shortly thereafter, on April 13, 1994, Judge Huddy orally granted SPJ's motion for summary judgment in the SPJ case and ordered the City to release to SPJ the information sought in SPJ's August 30, 1993 request. Enforcement of the order was stayed pending this court's disposition of SHOPO's appeal and Writ of Mandamus in the SHOPO case. In his written order, filed May 4, 1994, Judge Huddy found that the information requested by SPJ did not fall within any of Chapter 92F's specific exemptions or exclusions from the affirmative duty to disclose agency records and that the "HPD has an obligation to maintain such records [concerning professional misconduct of HPD employees resulting in suspension or discharge] in retrievable format." The court also ordered the HPD to pay all reasonable attorneys' fees and costs incurred by SPJ upon approval by the court.

On June 16, 1994, Judge Huddy partially granted the City's motion to reconsider and modified the May 4, 1994 order granting summary judgment to clarify that the HPD may charge the SPJ twenty-five cents per page for copying and that "the HPD may either produce a summary of the information requested or produce all documents pertaining to the subject matter, using whichever method of disclosure the HPD deems more expedient."

On December 6, 1994, Judge Huddy, responding to a motion filed by SPJ, ordered the City

to release to [SPJ] all information whose disclosure was ordered by this Court's Order of May 4, 1994, as clarified by this Court's Order of June 16, 1994, except for the names and identifying information of police officers disciplined or discharged for job-related misconduct, whose release is presently enjoined by order of the Supreme Court of the State of Hawaii pending trial and appeal of Civil No. 94–0547, and, pursuant to agreement of counsel,

---

3. SHOPO, joined by the Doe Officers, filed a notice of appeal from the denial of the motion for preliminary injunction on March 31, 1994 and also petitioned for a Writ of Mandamus. Prompted by this court's order to show cause why its appeal should not be dismissed, filed on April 19, 1994 in *SHOPO et al. v. City and County et al.*, S.Ct. No. 17957, SHOPO filed motions for reconsideration and for leave to take an interlocutory appeal. Judge Lim denied both motions, and this court dismissed SHOPO's appeal for lack of appellate jurisdiction by order filed on June 9, 1994. The stay of enforcement of the circuit court's denial of the preliminary injunction was transferred to the Petition for Writ of Mandamus in *SHOPO et al. v. Honorable John S.W. Lim*, S.Ct. No. 17958. This court later dismissed SHOPO's Petition for Writ of Mandamus, but stayed Judge Lim's order denying SHOPO's motion for preliminary injunction and invoked its supervisory powers to enjoin the City from releasing the names of the disciplined police officers until the trial on the merits of the SHOPO case and any subsequent appeals were completed. *See* Order of Dismissal, filed October 14, 1994 in *SHOPO v. Lim*, No. 17958.

388

Defendants are to release this information no later than December 7, 1994[.]

The City apparently complied, although the record is not clear regarding the extent of compliance. In its "Revised/Responsive Pretrial Statement," filed February 14, 1995 in the SHOPO case, SPJ stated that:

The Department subsequently released, pursuant to order of this Court entered in the parallel SPJ case, information on Department employees who are not officers who have been suspended or terminated for professional misconduct—*including these individual's names*—and information *except* the names of Department officers who have been suspended or terminated for job-related professional misconduct. Although the information that the Department provided pursuant to the Court's order does not cover the entire time-period requested by SPJ, it does cover a significant portion of it, and further information is expected to be forthcoming.

In the consolidated SHOPO/SPJ case,[4] the City filed, on July 20, 1995, a motion to dismiss, or, in the alternative, for summary judgment, with respect to SPJ's cross-claim, on the bases of mootness and res judicata. Judge Huddy's written order granting summary judgment in favor of the City with respect to SPJ's cross-claim was filed on November 24, 1995. In that order, the court ruled that:

IT IS FURTHER ADJUDGED, ORDERED AND DECREED that pursuant to the doctrine of collateral estoppel all parties are precluded from relitigating the issues decided in Civil No. 94-0657-02 [the SPJ case] and that the only issues remaining for adjudication in Civil No. 94-0547-02 [the SHOPO case] are the questions of (1) whether Plaintiff State of Hawaii Organization of Police Officers' collective bargaining agreement with Defendant Hono-

lulu Police Department, as well as Hawaii Revised Statutes Sections 89-9, 89-11, 89-19 and other provisions of Hawaii Revised Statutes Chapter 89 supersede Hawaii Revised Statutes Chapter 92F and protect from disclosure the information which Defendant Michael Nakamura intended to disclose pursuant to Hawaii Revised Statutes Chapter 92F on February 11, 1994; and (2) mootness.[5]

On September 11, 1995, OIP filed a motion for summary judgment on the remaining issues identified by Judge Huddy's order, in which SPJ and the City joined. Judge Huddy's written order, granting in part and denying in part OIP's motion for summary judgment, was filed January 10, 1996. The motion was granted with respect to mootness, the court having found that "[t]he legislative action which resulted in Act 242 does not moot this action." Summary judgment was denied on the issue of the effect of HRS chapter 89 and the CBA because Judge Huddy found:

First, there is a genuine issue of material fact as to whether or not the State of Hawaii Organization of Police Officers' Collective Bargaining Agreement with Defendant City and County of Honolulu prohibits disclosure of the names of suspended or discharged police officers.

Second, Hawaii Revised Statutes, Chapter 89 clearly pre-empts Hawaii Revised Statutes, Chapter 92F. The pre-emption provision of H.R.S. Chapter 89 is express and mandatory. There is nothing in H.R.S. Chapter 92F which excepts its provisions from the pre-emption section of Chapter 89, H.R.S.

Thus, whether or not disclosure is required is dependant upon the terms of an individual collective bargaining agreement. . . .

4. The City's motion to consolidate the SHOPO and SPJ cases was granted by order dated May 4, 1994. On May 12, 1994, almost one month after summary judgment was granted to SPJ, SHOPO sought leave to intervene in the SPJ case, which was denied as untimely. SHOPO appealed from that ruling, and, in a memorandum opinion, we affirmed. *SHOPO*, No. 18095 (Haw. May 30, 1995) (mem.).

5. The "mootness" issue arose during the briefing in appeal No. 18867. Act 242 became effective on July 6, 1995 and amended a relevant portion of HRS § 92F-14(b). *See supra* at 392 and *infra* at 399 for discussion of Act 242. The City argues, in its supplemental brief in No. 18867, as did SHOPO and the Doe Officers in the circuit court, that Act 242 renders this entire litigation moot.

Third, public policy is for the legislature to decide. As elected representatives of the people, the legislature is free to determine the policy on this issue one way or another and the judiciary may not interfere unless a dispute reaches constitutional proportions. Here, it does not.

The court thus ruled that whether SHOPO's current and former CBAs provide for the confidentiality of disciplinary records was an issue remaining for trial.

Judge Milks thereafter granted leave for the parties to file interlocutory appeals from the November 24, 1995 collateral estoppel ruling and the January 10, 1996 order partially granting and denying summary judgment, pursuant to HRS § 641–1(b).

## II. DISCUSSION

A. No. 18867: The Circuit Court's Order Granting SPJ's Motion For Summary Judgment [6]

█ It is well settled that:

On appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts. Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. In other words, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.

Barabin v. AIG Hawai'i Ins. Co., 82 Hawai'i 258, 260, 921 P.2d 732, 734 (1996) (quoting Harris v. DeSoto, 80 Hawai'i 425, 431, 911 P.2d 60, 66 (1996) (citation omitted)).

In reviewing the constitutionality of statutory provisions, this court "has long held that: (1) legislative enactments are presumptively constitutional; (2) a party challenging a statutory scheme has the burden of showing unconstitutionality beyond a reasonable doubt; and (3) the constitutional defect must be clear, manifest, and unmistakable." Pray v. Judicial Selection Comm'n, 75 Haw. 333, 340, 861 P.2d 723, 727 (1993) (citations, internal quotation marks, and brackets omitted).

1. **Act 191 was not retroactively applied.**

Preliminarily, we must determine which version of the UIPA governs this action. The City contends that, because SPJ's request sought records predating the 1993 amendments to the UIPA, the court's order compelling the disclosure of records dating back to 1988 erroneously applied the 1993 amendments retroactively, requiring reversal. We disagree.

HRS § 1–3 (1993) provides that "[n]o law has any retrospective operation, unless otherwise expressed or obviously intended." Also, this court has noted the "general rule in most jurisdictions that [s]tatutes or regulations which say nothing about retroactive application are not applied retroactively if such a construction will impair existing rights, create new obligations or impose additional duties with respect to past transactions." Clark v. Cassidy, 64 Haw. 74, 77 n. 6, 636 P.2d 1344, 1346 n. 6 (1981) (citations and internal quotation marks omitted).

█ Because Act 191 affects only an agency's prospective duty of disclosure and impairs no existing rights, we reject the City's argument that the 1993 amendments were improperly applied retroactively.[7] Other jur-

---

6. The City also appeals from the June 16, 1994 order granting in part and denying in part its motion for reconsideration, as well as orders awarding attorneys' fees to SPJ. The City, however, makes no arguments on these points presumably because it does not contest the amount or reasonableness of the fees awarded to SPJ or the fact that SPJ was the prevailing party entitled to an award of attorneys' fees under HRS § 92F–15(d). The City's only argument is that the order granting summary judgment must be reversed

and that, therefore, the orders awarding fees must be vacated.

7. If we were to accept the City's contention that Act 191 impairs existing rights, it is SPJ, rather than the City, whose rights have been impaired. Prior to its amendment by Act 191, HRS § 92F–14(b)(4) allowed disclosure of "information [in an agency's personnel file] relating to the status of any formal charges against the employee and disciplinary action taken[,]" without restriction. Act 191, however, clarified and limited the infor-

isdictions have rejected similar arguments under similar circumstances. In *State ex rel. Beacon Journal Publishing Co. v. University of Akron,* 64 Ohio St.2d 392, 415 N.E.2d 310 (1980), the Ohio Supreme Court considered an agency's contention that records generated prior to the effective date of an amendment to the public records disclosure statute are not "public records" and that ordering the agency to produce those records to the requesting newspaper constituted retroactive application of the amendments. The court stated that,

> [i]n examining [the relevant section of the public records disclosure statute], we initially note that it speaks in terms of "all public records" and makes no distinction for those records compiled prior to its effective date. *More importantly, however, is the simple fact that Beacon Journal is not seeking to apply the statute in a retrospective manner, but is instead seeking present access to the records.* Concededly, the creation of the records took place prior to the legislative amendment at issue, but this is not the conduct regulated by the statute. [The statute] deals with the availability of public records, not the recordation function of government units. The date the records were made is not relevant under the statute. Since the statute merely deals with record disclosure, not record keeping, *only a prospective duty is imposed upon those maintaining public records.*

*Id.,* 415 N.E.2d at 313 (emphases added). The Florida District Court of Appeal considered a similar issue in *News–Press Publishing Co., Inc. v. Kaune,* 511 So.2d 1023 (Fla. Dist.Ct.App.1987). In that case, a newspaper's request for records was denied because the requested records fell within an exception to the disclosure requirements of the Public Records Law that had been enacted the day prior to the newspaper's request. The newspaper appealed, arguing, *inter alia,* that the trial court's ruling was an "unwarranted retroactive application of the newly enacted amendment." *Id.* at 1026. The appellate court explained that

> [i]t would be illogical to base a[n] exemption of a class of public documents [from disclosure] on the question of whether the document came into existence prior to or subsequent to the date of exemption for those requests for disclosure made thereafter. It seems to us indisputable that if the legislature determines that "all documents pertaining to subject 'A' in personnel files shall be exempt," it intends, unless it specifies otherwise, that on the effective date of the law creating the exemption *all* such documents are exempt from any request for disclosure made thereafter regardless of when they came into existence or first found their way into the public records.

*Id.* (emphasis in original). *See also Industrial Found., Etc. v. Texas Indus. Accident Bd.,* 540 S.W.2d 668 (Tex.1976) (holding that Open Records Act does not impair any vested right and applies to all records, whether acquired before or after its effective date), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977).

■ Like the statutes construed in the cases cited above, HRS § 92F–11(a) provides that *"[a]ll* government records are open to public inspection unless access is restricted or closed by law." (Emphasis added.) "'Government record' means information

---

mation relating to public employee misconduct that could be disclosed.

> [Act 191] appropriately distinguishes between minor and more serious misconduct by focusing on the disciplinary consequences, and protects the employee from the disclosure of information while formal grievance procedures are still in progress. Yet the bill also serves the public at large by refusing to provide further protection from disclosure of misconduct when the employee has exhausted non-judicial grievance procedures, and has been suspended or discharged.
>
> Your Committee also finds that because of the unique responsibilities of police officers, special care must be taken to clearly delineate private conduct from conduct as a government employee.

Conf. Comm. Rep. No. 61, in 1993 Senate Journal, at 764. Prior to its amendment by Act 191, HRS § 92F–14(b)(4) would have allowed disclosure of information relating to incidents of public employee misconduct regardless of whether the charges had been sustained or resulted in suspension or discharge of the employee. SPJ, therefore, would have been entitled to *more* information prior to the 1993 amendment of HRS § 92F–14(b)(4).

maintained by an agency in written, auditory, visual, electronic, or other physical form." HRS § 92F–3. No distinction is made, nor is there any exemption, based upon the date that the record was created. We therefore hold that HRS Chapter 92F applies prospectively, requiring disclosure of records maintained by State agencies regardless of when the records came into existence. Accordingly, we further hold that the circuit court did not err by compelling disclosure of records created before the effective date of Act 191.

### 2. Act 242 does not moot this litigation.

■ The City also argues that the 1995 amendment of HRS § 92F–14(b)(4) by Act 242 moots this entire litigation. Act 242 further limited the allowed disclosure of information regarding misconduct by a police officer to misconduct resulting in discharge. The City argues that the four officers whose disciplinary records fell within SPJ's amended request received suspensions and that, because the amended HRS § 92F–14(b)(4)(B) does not apply to police officers "except in a case which results in the discharge of the officer[,]" the officers' disciplinary records may not be disclosed, and the litigation is moot. The argument is without merit. Section 4 of Act 242 expressly provides that "[t]his Act does not affect rights and duties that matured, penalties that were incurred, and proceedings that were begun, before its effective date." 1995 Haw. Sess. L. Act 242, § 4 at 643. The instant proceedings were begun well before the July 6, 1995 effective date and are, therefore, not affected by Act 242. Accordingly, we hold that Act 242 does not moot this litigation.

### 3. SPJ is a "person aggrieved" and has standing.

The City argues that summary judgment was improperly granted in favor of SPJ because whether the HPD actually denied SPJ's requests is a genuine issue of material fact. The City asserts that, rather than deny the request, Chief Nakamura informed SPJ that he would in fact comply if SPJ would either pay a fee, estimated at $20,000, or provide him with the names of individual employees whose names SPJ was seeking.

SPJ, however, "failed to follow Police Nakamura's simple instructions for obtaining [the requested] information from the HPD." Therefore, the City argues, because reasonable persons could reach different conclusions on the "critical issue" of whether SPJ's request was denied, summary judgment was inappropriate.

■ Whether the City actually denied SPJ's request, however, as opposed to merely failing to grant it, is not a "critical" or material factual issue for the purpose of summary judgment on the purely legal issue of whether disclosure is required by the UIPA. What the City appears to be arguing is that SPJ lacked standing to invoke the circuit court's jurisdiction, an issue that this court recognized, but did not need to reach, in *Kaapu v. Aloha Tower Development Corp.,* 74 Haw. 365, 385 n. 16, 846 P.2d 882, 890 n. 16 (1993) (noting that this court has not had occasion to delineate the standing requirements to seek judicial enforcement of access to government records under the UIPA).

HRS § 92F–15 (1993) governs judicial enforcement of the UIPA and provides that:

(a) *A person aggrieved by a denial of access to a government record* may bring an action against the agency at any time within two years after the agency denial to compel disclosure.

(b) In an action to compel disclosure the circuit court shall hear the matter de novo. Opinions and rulings of the office of information practices shall be admissible. The circuit court may examine the government record at issue, in camera, to assist in determining whether it, or any part of it, may be withheld.

(c) The agency has the burden of proof to establish justification for nondisclosure.

(d) If the complainant prevails in an action brought under this section, the court shall assess against the agency reasonable attorney's fees and all other expenses reasonably incurred in the litigation.

(e) The circuit court in the judicial circuit in which the request for the record is made, where the requested record is maintained, or where the agency's headquarters

are located shall have jurisdiction over an action brought under this section.

(f) Except as to cases the circuit court considers of greater importance, proceedings before the court, as authorized by this section, and appeals therefrom, take precedence on the docket over all cases and shall be assigned for hearing and trial or for argument at the earliest practicable date and expedited in every way.

*Id.* (emphasis added). To the extent that the City is suggesting that SPJ is not a "person aggrieved" because it was not flatly denied access to the disciplinary records, we disagree. The City's over-literal interpretation of HRS § 92F–15(a) would lead to an absurd result that was clearly unintended by the legislature, that is, that an agency could ignore a UIPA request with impunity because failure to respond is not technically a denial of a request.

■ Unlike the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (1994), and the Uniform Information Practices Code (UIPC), both of which the legislature considered when drafting the UIPA,[8] the UIPA does not impose deadlines on an agency's response to a records request or specify the potential responses that are subject to judicial review. Both the FOIA and the UIPC mandate that, when an agency receives a written request that reasonably identifies the record sought, it must respond promptly—within ten days and seven days, respectively—by either: (1) making the record available; (2) informing the requester that the record is in use or that unusual circumstances have delayed the handling of the request and specifying in writing the earliest date when the record will be available; (3) informing the requester that the agency does not maintain the record and identifying, if known, the agency that does; or (4) denying the request. 5 U.S.C. § 552(a)(6); UIPC § 2–102. Generally, a requester may seek judicial review of any adverse response or failure to timely respond, although the FOIA requires exhaustion of administrative remedies before judicial review is available. *See* 5 U.S.C. § 552(a)(6)(A) (providing for administrative appeal of "adverse determination" and judicial review after agency determination has been upheld in administrative appeal); UIPC § 2–104 (providing that person aggrieved by violation of UIPC § 2–102 may bring judicial action).

■ There is nothing in the UIPA or its legislative history to indicate that the legislature intended judicial review to be available only in the case of an agency's unequivocal and final denial of a UIPA request. The conference committee report explains that "[t]he bill will provide for *immediate* access to the courts when an agency refuses to release records." Conf. Comm. Rep. No. 112–88, in 1988 House Journal, at 818 (emphasis added). Moreover, HRS § 92F–15(f) requires the courts to expedite UIPA cases. Therefore, unlike the FOIA, the UIPA does not require the exhaustion of administrative remedies, although it provides, as an optional alternative, for appeal to the OIP. HRS § 92F–15.5 (Supp.1992).

Further, HRS § 92F–15 provides for *de novo* review of the agency's determination, places the burden of proof squarely on the agency, contains liberal venue provisions, and requires the court to assess attorneys' fees and costs against the agency if the complainant prevails. It was obviously the intent of the legislature to remove barriers to judicial enforcement of the UIPA; to construe the term "denial" strictly would defeat that intent.

■ We interpret "denial of access" as synonymous with "withholding of access." The United States Court of Appeals for the District of Columbia has defined "withholding" to include not only denials, but any agency response that has the "net effect . . . significantly to impair the requester's ability to obtain the records or significantly to increase the amount of time he [or she] must wait to obtain them." *McGehee v. CIA,* 697 F.2d 1095, 1110 (D.C.Cir.), *on reh'g, vacated in part on other grounds,* 711 F.2d 1076 (1983). Access is withheld, and a person

---

8. *See, e.g.,* Hse. Stand. Comm. Rep. No. 342–88, in 1988 House Journal, at 972 (indicating intent that commentary to the UIPC guide the interpretation of similar provisions in the UIPA) and Sen. Stand. Comm. Rep. No. 2580, in 1988 Senate Journal, at 1094 (noting that new section on privacy is modeled on the FOIA).

aggrieved thereby, not only by an agency's outright denial of access, but also, for example, by the agency's non-response, claim that the request was not specific enough to identify the records sought, imposition of unauthorized or excessive fees as a condition of access, or claim that it does not have the records sought. Under this interpretation, SPJ is clearly a "person aggrieved" and, therefore, has standing under HRS § 92F–15 because: (1) SPJ requested access to government records; and (2) access to the requested records was withheld.[9] Moreover, whether the HPD's response to SPJ's request was a "denial" or some other "adverse determination" is not a genuine issue of material fact with respect to the determination that SPJ was entitled by law to an order compelling disclosure of the requested records.

### 4. The UIPA requires government agencies to provide access to records within their possession and control.

In its order granting summary judgment to SPJ, the circuit court ruled that "the HPD has an obligation to maintain such records in retrievable format[,]" and that,

> [i]f an agency of State Government, as defined in the UIPA, has a duty to maintain records and to disclose information in those records, then the agency cannot attempt to pass the expenses of maintaining and disclosing those records on to requesters nor can it complain if it incurs expenses to comply with requests from the public that necessitate the segregation and/or assembly of records or information that the agency should have segregated earlier.

The court thus ordered the City to produce all documents responsive to SPJ's August 30, 1993 request.

SPJ's original request covered a span of five-and-a-half years and sought disciplinary records of both police officers and other HPD employees. The City argues that, because HPD had no central file for disciplinary records and the computer system it was developing to store and retrieve this type of

information was not yet operational, compliance with SPJ's August 30, 1993 request would have required a manual search of the individual personnel records of approximately two thousand active HPD employees as well as of those who had left the department during the relevant time period. Even assuming it was required to undertake such a search, which the City maintains it was not, compliance with SPJ's request was nevertheless impossible because the only documents that conclusively showed whether misconduct had occurred while police officers were acting in their capacities as police officers were the investigative reports of the Internal Affairs Division (IAD), which are only retained for thirty months.

 We agree that summary judgment was improperly granted with respect to SPJ's August 30, 1993 request because whether the HPD had retained possession of the responsive records is, at the least, a disputed issue of material fact. The circuit court's order requiring the HPD to comply with SPJ's August 30, 1993 request was apparently based on the conclusion that the UIPA imposes a duty to maintain or retain records, as opposed to disclosing them, and further dictates the format in which they must be maintained. Such a conclusion, however, finds no support in the plain language of the statute.

 The affirmative responsibility imposed on agencies by the UIPA is to make government records available for inspection and copying during regular business hours, upon request by any person. HRS 92F–11(b) (1993). "Government record," as stated, means any information maintained by an agency in physical form. Therefore, the UIPA requires agencies to provide access to those records that are actually maintained, but nowhere imposes an affirmative obligation to maintain records.

The United States Supreme Court, interpreting the federal FOIA in *Kissinger v. Reporters Comm. for Freedom of the Press,*

---

9. The City's argument could alternately be construed as one of ripeness, *i.e.*, that the case was not yet ripe for adjudication because there had

been no denial. Because our reasons for rejecting the City's standing argument apply equally to ripeness, we reject this argument as well.

445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980), reached the same conclusion.

Most courts which have considered the question have concluded that the FOIA is only directed at requiring agencies to disclose those "agency records" for which they have chosen to retain possession or control. *See also NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 221, 98 S.Ct. 2311, 2316, 57 L.Ed.2d 159 (1978), describing the Act as reaching "records and material in the possession of federal agencies...."

The conclusion that possession or control is a prerequisite to FOIA disclosure duties is reinforced by an examination of the purposes of the Act. The Act does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained.

*Id.* at 151–52, 100 S.Ct. at 969 (footnotes and some citations omitted) (ellipses in original).

Nothing in the UIPA requires the HPD to retain records of police officer misconduct for any specified period. However, if the IAD investigative reports are actually retained for only thirty months, then it would be indeed impossible for the HPD to provide access to such records dating back to 1988. Therefore, the extent of HPD's possession and control of records responsive to SPJ's August 30, 1993 request is a genuine issue of material fact, which cannot be resolved on the record before us.

As SPJ points out, the City did not claim, in opposition to SPJ's motion for summary judgment, that compliance with SPJ's August 30, 1993 request was impossible because the HPD did not retain possession of the relevant investigatory reports. Impossibility could, arguably, have been inferred from HPD's response to the OIP's inquiry, which was attached to HPD's memorandum in opposition to SPJ's motion for summary judgment. Although HPD's response stated that investigative reports are retained only for thirty months, it did not point out the significance of those reports. HPD's September 7, 1993 response to SPJ's August 30, 1993 request indicated HPD's willingness to provide the information if SPJ paid for its search time. The City nowhere explains how SPJ's payment of $20,000 would make the impossible possible. Moreover, we are unable to ascertain on this record how, and to what extent, HPD was able to comply with the court's December 6, 1994 order compelling it to release to SPJ all records requested in its original August 30, 1993 letter, with only the names of the police officers excluded. What *is* apparent from the record is that the HPD had documents that were at least partially responsive to SPJ's request, which it did not disclose. In its October 28, 1993 request, which expressly amended the earlier request, SPJ sought access to disciplinary records only of police officers, as opposed to all HPD employees, and only back as far as January 1, 1991, a period of less than thirty-five months. HPD never responded to this request, although it is undisputed that the bulk of the information responsive to this request was in the investigatory reports maintained in the IAD files.

We therefore hold that the circuit court erroneously ordered HPD to comply with SPJ's August 30, 1993 request because whether HPD was in possession of the records responsive to that request was a genuine issue of material fact. However, because that request was expressly amended by the October 28, 1993 request and because the records sought by the latter request were indisputably within HPD's possession, we further hold that it was the October 28, 1993 request that was operative.

### 5. Administrative burden does not excuse compliance.

██ In addition to impossibility, the City argues that it was not required to comply with SPJ's original request because it required an unduly burdensome search. Our holding that SPJ's October 28, 1993 request is the operative request resolves this issue because that request seeks only the disciplinary records of police officers, rather than of all HPD personnel and, therefore, does not require a manual search of all personnel files. Moreover, there is no exception in the UIPA for requests that an agency deems too burdensome.

The City cites to and quotes from *A.F.G.E., Local 2782 v. United States Dept. of Commerce,* 907 F.2d 203 (D.C.Cir.1990), for the proposition that "[a]n agency need not honor a request that requires 'an unreasonably burdensome search.'" *Id.* at 209 (citation omitted). *A.F.G.E.* and other federal cases interpreting the FOIA, however, are distinguishable. The FOIA expressly requires that "each agency, upon any request for records which (A) reasonably describes such records and (B) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3) (1986).[10] Therefore, in federal FOIA cases, whether the request "reasonably describes" the record sought is a frequently litigated issue because the agency has no duty to respond otherwise. It is in the context of this determination that federal courts have held that an agency need not honor a request that requires an unreasonably burdensome search. *See, e.g., A.F.G.E.,* 907 F.2d at 209 (stating that "neither request 'reasonably describes' a class of documents subject to disclosure, as required by 5 U.S.C. § 552(a)(3)(A)."); *Irons v. Schuyler,* 465 F.2d 608, 612 (D.C.Cir.1972) (explaining that request for all unpublished manuscript decisions of the Patent Office was a "broad, sweeping, indiscriminate request for production lacking any specificity" and "so broad in the context of the Patent Office files as not to come within a reasonable interpretation of 'identifiable records,'" so agency was not required to make available all documents in more than 3,500,000 files accumulated over more than a hundred years).

■ Where, however, the FOIA request complies with the requirements of section 552(a)(3)(A), the burden imposed on the agency is irrelevant. In *Sears v. Gottschalk,* 502 F.2d 122 (4th Cir.1974), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1494, 47 L.Ed.2d 753 (1976), the United States Court of Appeals for the Fourth Circuit considered the argument that the plaintiff's request for "all existing abandoned U.S. patent applications" was not a request for "identifiable records" within the meaning of section 552(a)(3), and that, therefore, the suit should be dismissed. *Id.* at 125. The court disagreed and distinguished *Irons,* stating:

> The purpose of the "identifiability" requirement is to generate a "reasonable description enabling the Government employee to locate the requested records." Although plaintiff's request was far reaching, that purpose was met. Aside from the sheer bulk of the material to which access was sought and the accompanying expense and inconvenience of making it available for inspection, defendant makes no claim that he does not know what plaintiff wishes to see or where to locate it. The case is thus different from *Irons v. Schuyler,* 151 U.S.App.D.C. 23, 465 F.2d 608 (1972), where access was sought to "all unpublished manuscript decisions of the Patent Office[.]" ... In that case, inspection was denied, but the decision turned on the difficulty of locating the requested records rather than the categorical nature of the request; we, therefore, do not deem it controlling here. *If otherwise locatable, the rule in this circuit is that equitable considerations of the costs, in time and money, of making records available for examination do not supply an excuse for non-production.*

*Id.* at 125–26 (some citations omitted) (emphasis added). *See also Tax Analysts v. United States Dept. of Justice,* 845 F.2d 1060, 1067 (D.C.Cir.1988) (stating that FOIA "does not confer judicial discretion to balance its dictates against the administrative burdens of disclosure"), *aff'd,* 492 U.S. 136, 109 S.Ct. 2841, 106 L.Ed.2d 112 (1989); *Army Times Pub. Co. v. Department of Army,* 684 F.Supp. 720, 723 (D.D.C.1988) (stating that "administrative inconvenience and burden [of complying with FOIA request] are not criteria by which Congress allowed FOIA requests to be judged"); *Ferguson v. Kelly,* 455 F.Supp. 324, 326 (D.C.Ill.1978) (stating "[t]hat response to a FOIA request may be time-consuming or burdensome is not a valid

---

**10.** Prior to its amendment in 1974, section 552(a)(3)(A) required that requests be for "reasonably identifiable records." *See* Pub.L. 93–502, § 1(b)(1); H. Rep. No. 93–876, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad. News 6267.

defense" because "[a]llowing such a defense would undercut the Act's broad policy of disclosure").

 The UIPA differs from the FOIA in that it does not contain language that conditions an agency's duty to respond on the form of the request. *See* HRS § 92F–11(b) (providing that "each agency upon request by any person" must make government records available for inspection and copying). Like the FOIA, however, the UIPA contains no exception from the disclosure requirements for requests deemed by the agency to be too burdensome. Although compliance with SPJ's August 30, 1993 request may have been time-consuming and costly, such burdens do not justify non-disclosure.

We recognize, however, that the legislature did not intend agencies to bear the entire financial burden of responding to UIPA requests. HRS § 92F–42(13) (Supp.1992) mandates that the OIP "shall adopt rules that set forth the fees and other charges that may be imposed for searching, reviewing, or segregating disclosable records, as well as to provide for a waiver of such fees when the public interest would be served." In the almost seven years since the enactment of HRS Chapter 92F, however, the OIP has failed to promulgate such rules, leaving State agencies without legal authority to impose fees to offset their costs of responding to UIPA requests. We are therefore not unsympathetic to Chief Nakamura's lament that "OIP has created an extremely difficult position for agencies to comply with the parameters of the UIPA." However, because we have held that SPJ's August 30, 1993 request was superseded by its October 28, 1993 request, we need not consider whether to create an equitable exception based upon the legislature's obvious intent that agencies not bear unreasonable financial burdens in responding to UIPA requests.

In a related argument, the City, relying on HRS § 92F–11(c), asserts that the circuit court committed reversible error by ordering the City to create a roster of disciplined employees. The City's argument is patently

meritless. HRS § 92F–11(c) provides that "[u]nless the information is readily retrievable by the agency in the form in which it is requested, an agency shall not be required to prepare a compilation or summary of its records." The circuit court's order granting summary judgment, as modified by its June 16, 1994 order, states that "the HPD may *either produce a summary* of the information requested *or produce all documents* pertaining to the subject matter, *using whichever method of disclosure the HPD deems more expedient.*" (Emphases added.) Clearly, the City was not ordered to create a "roster." Accordingly, we discern no error.

### 6. Constitutionality of Act 191

At the heart of the City's appeal is its contention that disclosure of police disciplinary records, pursuant to HRS § 92F–14(b)(4)(B), constitutes an unconstitutional invasion of police officers' right of privacy [11] in violation of article I, section 6 of the Hawai'i Constitution, which provides that "[t]he right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest. The legislature shall take affirmative steps to implement this right."

The UIPA, and the challenged amendment by Act 191, implements article I, section 6 of the Hawai'i Constitution, and states: "The policy of conducting government business as openly as possible must be tempered by a recognition of the right of the people to privacy, as embodied in section 6 and 7 of Article I of the Constitution of the State of Hawaii." HRS § 92F–2. Among the "underlying purposes and policies" of the UIPA is to "balance the individual privacy interest and the public access interest, allowing access unless it would constitute a clearly unwarranted invasion of personal privacy." *Id.*

In adopting Act 191, the Legislature balanced the competing interests of individual privacy and public access and concluded, as a matter of public policy, that after a public employee has exhausted any nonjudicial grievance procedures available to him or her

---

11. Inexplicably, the City focuses its argument on the privacy rights of police officers. With respect to other HPD employees, the City does not argue that releasing their names and disciplinary records violates their constitutional right to privacy.

and charges of employment-related misconduct have been sustained, resulting in suspension or discharge, the public interest in disclosure of that person's name and information regarding the misconduct outweighs the employee's privacy interest. The City has failed to overcome the presumption that the Legislature has achieved this balance in accordance with the mandate of article I, section 6 of the Hawai'i Constitution.

■■■ Moreover, considering the history of article 1, section 6 of the Hawai'i Constitution, our prior interpretation of that section, and the great weight of authority from other jurisdictions, we hold that information regarding a police officer's misconduct in the course of his or her duties as a police officer is not within the protection of Hawai'i's constitutional right to privacy.

The committee reports of the Constitutional Convention of Hawai'i of 1978 indicate that article I, section 6 "relates to privacy in the informational and personal autonomy sense." Stand. Comm. Rep. No. 69, in *Proceedings of the Constitutional Convention of Hawaii of 1978* [hereinafter, *Proceedings* ], Vol. I, at 674. The Committee of the Whole stated that:

> By amending the Constitution to include a separate and distinct privacy right, it is the intent of your Committee to insure that privacy is treated as a fundamental right for purposes of constitutional analysis. Privacy as used in this sense concerns the possible abuses in the use of *highly personal and intimate information* in the hands of government or private parties but is not intended to deter the government from the legitimate compilation and dissemination of data. More importantly, this privacy concept encompasses the notion that *in certain highly personal and intimate matters, the individual should be afforded freedom of choice absent a compelling state interest.*

Comm. Whole Rep. No. 15, in *Proceedings, supra,* at 1024 (emphases added).

This court first focused on the scope of informational privacy in *Nakano v. Matayoshi,* 68 Haw. 140, 706 P.2d 814 (1985), and concluded that, although

> the people of Hawaii have a legitimate expectation of privacy where their personal financial affairs are concerned[,] ... we cannot say that *an employee* of the State or any of its political subdivisions may reasonably expect that his [or her] interest in avoiding disclosure of his [or her] financial affairs is protected to the same extent as that of other citizens[.]

*Id.* at 148, 706 P.2d at 819 (emphasis added).

In *Painting Industry of Hawaii Market Recovery Fund v. Alm,* 69 Haw. 449, 746 P.2d 79 (1987), we considered a claim that public disclosure of a settlement agreement between the Department of Commerce and Consumer Affairs (DCCA) and a contractor, pursuant to HRS § 92–50,[12] would violate the contractor's right to privacy because of the inference that the contractor may have violated state statutes in the past. We concluded that the agreement came within the definition of "public record":

> In this instance, the public has a legitimate interest in knowing whether our contract licensing laws are being properly enforced by governmental agencies, and in knowing who is violating these laws.
>
> Thus, we conclude that [the contractor's] right to privacy would not be violated by disclosure, and therefore, the settlement agreement is a public record under HRS § 92–50.

*Id.* at 452, 746 P.2d at 81. After examining whether disclosure of the settlement agreement would be in violation of HRS Chapter 92E, the precursor to HRS Chapter 92F, we stated that "HRS Chapter 92E was expressly intended to implement in part the right of privacy codified in the 1978 amendment to

---

12. HRS § 92–50 (1985), which was repealed on the effective date of HRS chapter 92F, provided that:

As used in this part, "public record" means any written or printed report, book or paper, map or plan of the State or of a county and their respective subdivisions and boards,

which is the property thereof, and in or on which an entry has been made or is required to be made by law, or which any public officer or employee has received or is required to receive for filing, *but shall not include records which invade the right of privacy of an individual. Id.* (emphasis added).

the Hawaii State constitution in article I, section 6." *Id.* at 452, 746 P.2d at 81 (citation omitted). Therefore, "the scope of information protected must be consistent with that right." *Id.* at 453, 746 P.2d at 81–82.

██ Under the holding in *Painting Industry*, the privacy right protected by the "informational privacy" prong of article I, section 6 is the right to keep confidential information which is "highly personal and intimate." The issue, therefore, is whether the identities and disciplinary records of police officers who have engaged in such misconduct in the course of their public duties as to warrant suspension or dismissal is "highly personal and intimate information." The legislature, having determined as a matter of public policy that public employees who have been suspended or discharged for employment-related misconduct do not have a significant privacy interest in information about that misconduct, obviously answered in the negative. So too have those jurisdictions that have considered the issue.

██ Several jurisdictions employ a common law analysis of invasion of privacy to interpret the privacy exceptions in the jurisdictions' public records statutes. The analysis is not without applicability to Hawai'i's constitutional right to privacy. The Standing Committee equated "privacy in the informational sense" with the common law right of privacy:

> Your Committee believes that the right of privacy encompasses the common law right of privacy or tort privacy. This is a recognition that the dissemination of private and personal matters, be it true, embarrassing or not, can cause mental pain and distress far greater than bodily injury. For example, the right can be used to protect an individual from invasion of his private affairs, public disclosure of embarrassing facts, and publicity placing the individual in a false light.

Stand. Comm. Rep. No. 69, *Proceedings, supra,* at 674. Therefore, it is appropriate, when determining whether disclosure of information implicates the constitutional right to privacy, to consider whether the disclosure would result in tort liability for invasion of privacy. As set forth in *Restatement (Second) of Torts* [hereinafter, *Restatement*] § 652D, 383 (1977), "[o]ne who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his [or her] privacy, if the matter publicized is of a kind that (a) would be regarded as highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." The comment illustrates the nature of information protected by this right to privacy, which parallels the "highly personal and intimate information" protected by article l, section 6:

> Every individual has some phases of his [or her] life and his [or her] activities and some facts about himself [or herself] that he [or she] does not expose to the public eye, but keeps entirely to himself [or herself] or at most reveals only to his [or her] family or to close personal friends. Sexual relations, for example, are normally entirely private matters, as are family quarrels, many unpleasant or disgraceful or humiliating illnesses, most intimate personal letters, most details of a man's [or woman's] life in his [or her] home, and some of his [or her] past history that he [or she] would rather forget. When these intimate details of his [or her] life are spread before the public gaze in a manner highly offensive to the ordinary reasonable [person], there is an actionable invasion of his [or her] privacy, unless the matter is one of legitimate public interest.

*Id.* at 386, comment b.

Applying this standard, the Washington Supreme Court, in *Cowles Publishing Co. v. State Patrol,* 109 Wash.2d 712, 748 P.2d 597 (1988), held that names of law enforcement officers, against whom complaints had been sustained after internal investigations, were not exempt from disclosure under a provision of Washington's public disclosure act that excepted "[p]ersonal information in files maintained for employees, appointees, or elected officials of any public agency to the extent that disclosure would violate their right to privacy." *Id.,* 748 P.2d at 601. The court reasoned that,

> [i]n contrast to the types of information listed in the Restatement's comment [b], the information contained in the police in-

vestigatory reports in the present case does not involve private matters, but does involve events which occurred in the course of public service. *Instances of misconduct of a police officer while on the job are not private, intimate, personal details of the officer's life . . . .* They are matters with which the public has a right to concern itself.

*Id.* at 605 (emphasis added). In balancing the interests involved, the court concluded that:

If the off duty acts of a police officer bear upon his or her fitness to perform public duty or if the activities reported in the records involve the performance of a public duty, then the interest of the individual in "personal privacy" is to be given slight weight in the balancing test and the appropriate concern of the public as to the proper performance of public duty is to be given great weight. In such situations privacy considerations are overwhelmed by public accountability.

*Id.* The court, however, held that the records at issue were exempt from disclosure under an exception for investigative records necessary for effective law enforcement. *Id.* at 608. *See also White v. Fraternal Order of Police,* 909 F.2d 512, 517 (D.C.Cir.1990) (stating that drug use or administering of tests to detect drug use among police officers can never be regarded as mere "private facts"); *Coughlin v. Westinghouse Broadcasting and Cable, Inc.,* 603 F.Supp. 377 (E.D.Pa.1985) (granting summary judgment against police officer who claimed, *inter alia,* that television broadcast portraying his alleged misconduct on the job invaded his privacy because "the broadcast dealt with [officer's] public activity as a police officer. A police officer's on-the-job activities are matters of legitimate public interest, not private facts. A publication dealing with those activities thus cannot be the basis for an invasion of privacy action." (Citing *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 492–95, 95 S.Ct. 1029, 1044–46, 43 L.Ed.2d 328 (1975) and *Restatement, supra,* § 652D)), *aff'd,* 780 F.2d 340 (3rd Cir.1985), *cert. denied,* 476 U.S. 1187, 106 S.Ct. 2927, 91 L.Ed.2d 554 (1986)); *Rawlins v. Hutchinson Publishing Company,* 218 Kan. 295, 543 P.2d 988 (1975) (finding no invasion of privacy where newspaper published account of police officer's alleged misconduct in office because facts did not concern the "private life" of the officer and "a truthful account of misconduct in office cannot form the basis of an action for invasion of privacy."); *Obiajulu v. City of Rochester,* 213 A.D.2d 1055, 625 N.Y.S.2d 779, 780 (N.Y.App.Div.1995) (explaining that "[d]isciplinary files containing disciplinary charges, the agency determination of those charges, and the penalties imposed . . . are not exempt from disclosure . . . [because they are not] 'personal and intimate details of an employee's personal life.' "); *Spokane Police v. Liquor Control Board,* 112 Wash.2d 30, 769 P.2d 283, 286–87 (1989) (holding that disclosure of investigative report into liquor law violations at bachelor party held at private police guild club and attended by police officers did not implicate right to privacy, which "is commonly understood to pertain only to the intimate details of one's personal and private life." (Citing *Restatement, supra,* § 652D)).

Under this reasoning, and consistent with this court's analysis in *Painting Industry,* information regarding charges of misconduct by police officers, in their capacities as such, that have been sustained after investigation and that have resulted in suspension or discharge is not "highly personal and intimate information" and, therefore, is not within the protection of Hawai'i's constitutional right to privacy.

The City's argument that "States with constitutions and/or statutes similar to Hawaii's have also ruled that employment records should be afforded privacy protection[,]" as this court did in *Painting Industry,* misses the point. In *Painting Industry,* the court observed that only " 'highly personal and intimate information,' such as medical, financial, educational, or employment records[,]" is within the scope of the constitutional right to privacy. *Painting Industry* and the other cases cited by the City, however, simply establish that, generally, personnel records may contain information that, if disclosed, would constitute an invasion of privacy. This is not at issue. HRS § 92F–14(b)(4) expressly confirms that an individual has a

"significant privacy interest" in information in an agency's personnel file, with the exception of the specified information relating to misconduct. This information unrelated to misconduct, therefore, is exempt from the general disclosure requirement unless "the public interest in disclosure outweighs the privacy interests of the individual." HRS § 92F–14(a).

The City cites two Montana cases, *Missoulian v. Board of Regents of Higher Education,* 207 Mont. 513, 675 P.2d 962 (1984), and *Montana Human Rights Division v. City of Billings,* 199 Mont. 434, 649 P.2d 1283 (1982), in support of the undisputed proposition that personnel records are afforded privacy protection. However, the Montana Supreme Court subsequently made clear in *Great Falls Tribune v. Sheriff,* 238 Mont. 103, 775 P.2d 1267 (1989), that not all information in personnel files warrants constitutional protection. Under a constitutional provision almost identical to article I, section 6 of the Hawai'i Constitution, the *Great Falls Tribune* court held that disclosure of records of police officer misconduct did not infringe on the officers' constitutional right to privacy because, "whatever privacy interest the officers have in the release of their names as having been disciplined, it is not one which society recognizes as a strong right." *Id.,* 775 P.2d at 1269. *See also Jones v. Jennings,* 788 P.2d 732 (Alaska 1990) (holding that disclosure of police officer's disciplinary records did not violate officer's constitutional right to privacy, which is protected as fundamental right under Alaska Constitution). The *Great Falls Tribune* court noted that, although the disciplinary records were not constitutionally protected, "we are not ruling that the entirety of any personnel files must be released." 775 P.2d at 1269. This is, of course, the identical result achieved by the application of HRS § 92F–14(b)(4). *See also Mason v. Stock,* 869 F.Supp. 828, 833 (D.Kan. 1994) (stating that psychological records are the only items in police officers' personnel files that are "so highly personal and sensitive" in nature that they are within the federal constitutional zone of privacy).

■ We hold that HRS § 92F–14(b)(4)(B) does not implicate the right of privacy protected by article I, section 6 of the Hawai'i Constitution. The information that must be disclosed pursuant HRS § 92F–14(b)(4)(B) regarding a public employee's employment-related misconduct and resulting discipline, is not "highly personal and intimate information" and is, therefore, not within the scope of Hawai'i's constitutional right to privacy.

**B.** *Nos. 19558 and 19571: SHOPO and the Doe Officers are Not Collaterally Estopped From Relitigating the Constitutionality of Act 191.*

Both SHOPO and the Doe Officers appeal from the November 24, 1995 ruling that, "pursuant to the doctrine of collateral estoppel all parties are precluded from relitigating the issues decided in [the SPJ case]." Because the constitutionality of HRS § 92F–14(b)(4)(B) was litigated and decided in the SPJ case, the order implicitly precludes SHOPO and the Doe Officers from litigating that issue. SHOPO and the Doe Officers argue that the ruling was erroneous because they were not parties to the SPJ case and were not in privity with any party. SPJ invites the court to adopt the doctrine of "virtual representation," which "allow[s] the preclusion of parties not present in the first case, provided that someone who was present had the same interests as the absent party and so had every reason to prosecute or defend the case as vigorously." (Quoting *Petit v. City of Chicago,* 766 F.Supp. 607, 611 (C.D.Ill.1991)).

■ We recently reviewed the three-pronged test used to determine whether collateral estoppel bars relitigation of an issue and explained that collateral estoppel is a bar where: (1) the issue decided in the prior suit is identical to the issue presented in the action in question; (2) there was a final judgment on the merits in the prior suit; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior suit. *Bush v. Watson,* 81 Hawai'i 474, 480, 918 P.2d 1130, 1136 (1996). With respect to the third requirement, the court recognized that

As the preclusive effects of judgments have expanded to include nonparties in

more and more situations, however, it has come to be recognized that the privity label simply expresses a conclusion that preclusion is proper. As to privity, current decisions look directly to the reasons for holding a person bound by a judgment. *Id.* at 480, 918 P.2d at 1136 (quoting 18 Wright, Miller & Cooper, *Federal Practice and Procedure* [hereinafter, Wright, Miller & Cooper] § 4449, at 418–19 and Supp. (1995) at 331.) We declined, however, in *Bush,* to preclude a non-party to the prior litigation based on, essentially, "virtual representation," and we decline to do so now. We adhere to our ruling in *Bush* that for a party to the prior litigation to have been representing a nonparty, "the representative must have been appointed by a valid procedure." *Bush,* 81 Hawai'i at 481, 918 P.2d at 1137 (quoting Wright, Miller & Cooper, *supra,* § 4454, at 463).

 Although we hold that the circuit court erred when it determined that SHOPO and the Doe Officers are collaterally estopped from relitigating the constitutionality of HRS § 92F–14(b)(4)(B), on remand, any relitigation of that issue will, of course, be governed by our decision on the merits in this case, which is binding precedent and was decided on indistinguishable facts.

C. *No. 19583: the Circuit Court's Order Granting in Part and Denying in Part OIP's Motion for Summary Judgment*

OIP and SPJ appeal from the circuit court's order partially denying OIP's motion for summary judgment, in which the court ruled that, because Hawai'i's Collective Bargaining Law, HRS Chapter 89, contains an express preemption provision and nothing in HRS Chapter 92F excepts UIPA's provisions from preemption by HRS Chapter 89, "whether or not disclosure is required is dependent upon the terms of an individual collective bargaining agreement." The cir-

cuit court ruled that whether the CBA between SHOPO and the City prohibits disclosure of the names of disciplined officers was a genuine issue of material fact that precluded summary judgment.

OIP and SPJ argue that: (1) the preemption provisions of HRS § 89–19 do not apply because there is neither an express nor an implied conflict between chapters 89 and 92F; (2) assuming arguendo that the provisions of the CBA are incorporated into chapter 89, only matters that are subject to mandatory or permissible negotiation are preempted by HRS § 89–19, and prohibitions upon the disclosure of information that must be publicly available under the UIPA is an illegal subject of collective bargaining; and (3) affirmation of the circuit court's ruling would lead to absurd and unjust results— allowing the abrogation of statutory rights and responsibilities through private agreement.

SHOPO and the Doe Officers respond that: (1) HRS § 89–19 clearly and unambiguously preempts and takes precedence over all conflicting statutes with respect to the terms and conditions of public employment, and it is therefore unnecessary to resort to legislative history; (2) provisions of HRS chapter 89 conflict with, and therefore preempt, the provisions of HRS chapter 92F; and (3) affirmation of the circuit court's order will not lead to absurd results because the nondisclosure follows the past practices of the HPD, incorporated in the CBA.[13]

 Resolution of this issue requires us to construe the meaning of HRS § 89–19 (1993), which provides:

**Chapter takes precedence, when.** This chapter shall take precedence over all <u>conflicting statutes concerning this subject matter</u> and shall preempt all contrary local ordinances, executive orders, legislation, rules, or regulations adopted by the State,

---

**13.** SHOPO also argues that this action should be dismissed because OIP and SPJ's opening briefs failed to comply with Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4). SHOPO's contention borders on the frivolous and stems from an apparent misreading of the rule.

Equally meritless is the argument by SHOPO and the Doe Officers that SPJ's claims have been

rendered moot by Act 242 of the 1995 Hawai'i Session Laws. As discussed in Section II.A.2 of this opinion, Act 242 contains an express savings clause for proceedings begun before the effective date of the Act. Moreover, SHOPO and the Doe Officers failed to appeal from the circuit court's ruling that Act 242 does not moot this litigation.

a county, or any department or agency thereof, including the departments of personnel services or the civil service commission.

HRS § 89–19 (bold emphasis in original) (underscoring added).

> The standard of review for statutory construction is well-established. The interpretation of a statute is a question of law which this court reviews *de novo*. In addition, our foremost obligation is to ascertain and give effect to the intention of the legislature[,] which is to be obtained primarily from the language of the statute itself. And where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning.

*State v. Baron,* 80 Hawai'i 107, 113, 905 P.2d 613, 619, *reconsideration granted in part and denied in part,* 80 Hawai'i 187, 907 P.2d 773 (1995) (citation omitted). However, "we are not limited to the words of the statute to discern the underlying policy which the legislature seeks to promulgate but may look to relevant legislative history." *State v. Wells,* 78 Hawai'i 474, 896 P.2d 930 (1995) (internal brackets, ellipsis points, and citation omitted).

*Richard v. Metcalf,* 82 Hawai'i 249, 252, 921 P.2d 169, 172 (1996).

1. **HRS Chapter 92F is not a conflicting statute concerning the same subject matter as the collective bargaining law.**

By the express language of HRS § 89–19, HRS Chapter 89 takes precedence over "all conflicting statutes concerning this subject matter." The subject matter of HRS Chapter 89 is stated in its title—"collective bargaining in public employment." HRS § 89–1

(1993), subtitled "statement of findings and policy," provides in pertinent part that:

> The legislature declares that it is the public policy of the State to promote harmonious and cooperative relations between government and its employees and to protect the public by assuring effective and orderly operations of government. These are best effectuated by (1) recognizing the right of public employees to organize for the purpose of collective bargaining, (2) requiring the public employers to negotiate with and enter into written agreements with exclusive representatives on matters of wages, hours, and other conditions of employment, while, at the same time, (3) maintaining merit principles and the principle of equal pay for equal work among state and county employees pursuant to sections 76–1, 76–2, 77–31, and 77–33, and (4) creating a labor relations board to administer the provisions of chapter 89 and 377.

 Nothing in HRS Chapter 89 is explicitly contrary to, or inconsistent with, any of the provisions of HRS Chapter 92F. Specifically, HRS Chapter 89 does not require the confidentiality of any information that must be made publicly accessible under HRS Chapter 92F.

SHOPO and the Doe Officers would have us interpret "all conflicting statutes concerning the same subject matter" as any statute that touches on a matter that could be considered a "condition of employment" under HRS Chapter 89. Their argument, essentially, is that confidentiality of disciplinary records is a condition of employment that is negotiable under HRS Chapter 89,[14] and, because the UIPA requires disclosure of certain disciplinary records, it makes confidentiality nonnegotiable. Thus, the UIPA is a

---

14. SHOPO and the Doe Officers cite *In the Matter of University of Hawaii Professional Assembly and Board of Regents, U.H.,* HLRB Case # CE–07–152 (March 23, 1992), Order Granting Motion For Partial Summary Judgment, in support of the proposition that confidentiality of disciplinary records is negotiable under HRS Chapter 89. In that case, the Hawaii Labor Relations Board (HLRB) purportedly ruled that "the confidentiality of disciplinary proceedings is inextricably intertwined with the right to negotiate procedures relating to disciplinary actions and is

therefore negotiable." The cited case, however, is not published in the HLRB reporter and does not appear in the record on appeal as cited by SHOPO. Moreover, the HLRB's ruling is not binding precedent and, because it represents a conclusion of law, would be reviewed *de novo.* Because we conclude *infra* that an agreement to keep confidential records whose disclosure is mandated by the UIPA is an illegal subject of negotiation, we disagree with the purported HLRB ruling to the extent that it holds otherwise.

"conflicting statute concerning the same subject matter." SHOPO and the Doe Officers contend that because confidentiality of disciplinary records was negotiated and included in the CBA, the provisions of the CBA preempt the UIPA.

SHOPO and the Doe Officers' argument, adopted by the circuit court, that the provisions of a CBA supersede any statute that arguably implicates a condition of employment is untenable and is unsupported by the language of HRS § 89–19 or the legislative history of HRS Chapter 89. Nor, as SHOPO candidly admitted at oral argument, is there a single authority in support of the proposition.

■ The flaw in SHOPO and the Doe Officers' reasoning is that it is the provisions of HRS chapter 89 itself—and not those of the CBA—that are accorded preemptive effect against all other conflicting statutes on the same subject matter. By its own language, HRS § 89–19 accords preemptive effect to the provisions of HRS chapter 89 and not to the agreements entered into between parties pursuant to the authority, procedures, and rules established in HRS chapter 89. *See* HRS § 89–19 (stating that *"[t]his chapter* shall take precedence over all conflicting statutes...." (Emphasis added.)).

The legislative history of HRS Chapter 89 does not support the broad interpretation of HRS § 89–19 urged by SHOPO and the Doe Officers. The history indicates that the legislature intended to mandate collective bargaining on terms and conditions of public employment, but that the scope of negotiable topics is tempered by an employer's public responsibilities:

> 4. **Scope of Negotiations.** Your Committee concurs that there is no reason to limit the scope of negotiations insofar as terms agreed to in the course of collective bargaining are consistent with the merit principles and the principle of equal pay for equal work and does not interfere with the rights of a public employer to carry out its public responsibilities.

15. HRS § 8–1 (1993) provides in pertinent part that "[t]he following days of each year are set

Sen. Stand. Comm. Rep. No. 745–70, in 1970 Senate Journal, at 1332 (bold emphasis in original) (underscoring added). *See also* Hse. Stand. Comm. Rep. No. 761–70, in 1970 House Journal, at 1171; Hse Stand. Comm. Rep. No. 752–70, in 1970 House Journal, at 1165 (stating that "terms agreed to in the course of collective bargaining ... must not interfere with the rights of a public employer to carry out public responsibilities"). We have expressly recognized that the permissible scope of negotiation is not unlimited:

> The legislative history reveals that the intent of the legislature in enacting HRS § 89–9 was to allow the public employees and their employers free range in negotiating the terms of their contract *as long as those terms ... do not interfere with the rights of a public employer to carry out its public responsibility.*

*Hawaii Pub. Employment Relations Bd. v. United Pub. Workers,* 66 Haw. 461, 471, 667 P.2d 783, 790 (1983) (footnote omitted) (some emphasis omitted) (emphasis added). Because a public employer's "public responsibilities" must certainly include the duties imposed by HRS Chapter 92F and other duly enacted legislation, the limitation recognized in *United Pub. Workers* would be meaningless if we adopted the circuit court's broad interpretation of HRS § 89–19.

■ Although this court has not yet had occasion to construe the scope of HRS § 89–19, the United States District Court for the District of Hawai'i has considered the argument that, pursuant to HRS § 89–19, the provisions of a CBA preempt validly enacted legislation. In *Cammack v. Waihee,* 673 F.Supp. 1524 (D.Hawai'i 1987), *aff'd,* 932 F.2d 765 (9th Cir.1991), *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992), the plaintiffs challenged the constitutionality of HRS § 8–1,[15] which declared Good Friday to be a legal holiday. In support of their argument that the federal court should abstain from hearing the case, the defendants in *Cammack* argued that, because the CBAs of public employees in Hawai'i provided that Good Friday was a holiday, under HRS § 89–19, the CBA provisions preempted

apart and established as state holidays: ... The Friday preceding Easter Sunday, Good Friday[.]"

HRS § 8–1. Rejecting the defendants' arguments, the *Cammack* court stated:

> This court finds that Hawaii Rev. Stat. § 8–1, which establishes Good Friday as a legal holiday, is in no way conflicting with Hawaii's collective bargaining statutes. Chapter 89 of the Hawaii Revised Statutes, wherein are found the collective bargaining statutes, does not mandate that Good Friday be included in all collective bargaining agreements as a paid leave day. The inclusion of this holiday into the collective bargaining agreements is a matter of contract and not a matter of legislation. *Furthermore, the argument that the inclusion of a Good Friday holiday into the collective bargaining agreements of approximately 65% of Hawaii's public employees suspends the effect of a validly enacted statute of the state strains credulity. Accordingly, Hawaii Rev. Stat. § 8–1 is not preempted.*

673 F.Supp. at 1529 (emphasis added). Similarly, in the present case, HRS chapter 89 does not mandate that HPD disciplinary records must be kept confidential.

We are persuaded by the Ohio Supreme Court's interpretation of a functionally identical statute. In *State ex rel. Dispatch Printing Co. v. Wells,* 18 Ohio St.3d 382, 481 N.E.2d 632 (1985), the plaintiff-newspaper sought to compel the commissioner of the Logan Civil Service Commission (the commissioner) to permit access to the chief of police's personnel files following the chief's demotion to a detective position. In support of his refusal to allow the newspaper access to the files, the commissioner argued that a provision in a CBA between the city of Logan and its municipal police force, requiring the city to take all reasonable precautions to ensure the confidentiality of the personnel records of police officers, takes precedence over the mandates of the statute allowing inspection of public records. The commissioner relied on the Revised Code of Ohio (R.C.) 4117.10(A), which, similarly to HRS § 89–19, provides that "Chapter 4117 of the Revised Code prevails over any and all other conflicting laws, resolutions, provisions, present or future, except as otherwise specified in

Chapter 4117 of the Revised Code or as otherwise specified by the general assembly."

Rejecting the commissioner's argument, the *Wells* court noted that

> respondents' contention requires an unreasonable construction of R.C. Chapter 4117. The wording in the cited portion of R.C. 4117.10(A) was designed to free public employees from conflicting laws which may act to interfere with the newly established right to collectively bargain. *If respondents' construction of this provision were accepted, private citizens would be empowered to alter legal relationships between a government and the public at large via [CBAs]. It is an axiom of judicial interpretation that statutes be construed to avoid unreasonable or absurd consequences.*

*Id.,* 481 N.E.2d at 634 (emphasis added) (citations omitted). Like the defendant's interpretation of the Ohio statute rejected in *Wells,* the circuit court's interpretation of HRS § 89–19 would effect unreasonable and absurd consequences.

The circuit court's interpretation—that a CBA may preempt any statute which arguably touches upon a condition of employment—ignores the language of HRS § 89–19, which gives HRS Chapter 89, rather than a CBA, preemptive effect, and only over "conflicting statutes concerning [the same] subject matter." The legislative history of HRS Chapter 89 leaves no doubt that the legislature did not intend the result urged by SHOPO and the Doe Officers, because that result would "interfere with the rights of a public employer to carry out its public responsibilities."

### 2. Compliance with statutes is non-negotiable and CBAs that prevent a government agency from complying with its statutory duties are unenforceable as against public policy.

The interpretation of HRS § 89–19 urged by SHOPO and the Doe Officers, and adopted by the circuit court, would, as the OIP and SPJ contend, lead to an absurd result: that the requirements of HRS chapter 92F and, in effect, all statutes, rules, or regulations, may be avoided or contradicted

by private contractual agreement reached by collective bargaining. As this court recently noted, "[p]arties may not do by contract that which is prohibited by statute." *Heatherly v. Hilton Hawaiian Village Joint Venture*, 78 Hawai'i 351, 354, 893 P.2d 779, 782, *as amended on partial grant of reconsideration*, 78 Hawai'i 474, 896 P.2d 930 (1995) (citations omitted).

The United States Supreme Court has observed that, "[a]s with any contract ... a court may not enforce a collective-bargaining agreement that is contrary to public policy." *W.R. Grace & Co. v. Local Union 759, Intern. Union of United Rubber, Cork, Linoleum and Plastic Workers of Amer.*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). "Such a policy, however, must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Id.* (quoting *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 450, 89 L.Ed. 744 (1945)).

Other federal courts have noted that it "is elementary that parties to a collective bargaining agreement cannot bargain for provisions that are contrary to law." *Devine v. Brisco*, 733 F.2d 867, 872 (Fed.Cir.1984). *See, e.g., Laffey v. Northwest Airlines*, 582 F.Supp. 280, 283 (D.D.C.1982) (holding that "rights secured to employees by the Equal Pay Act cannot be collectively bargained away"), *rev'd in part on other grounds*, 740 F.2d 1071 (1984), *cert. denied*, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 951 (1985); *Craik v. Minnesota State Univ. Bd.*, 731 F.2d 465, 472 n. 10 (8th Cir.1984) (noting that "rights assured by Title VII are not rights which can be bargained away—either by a union, by an employer, or by both acting in concert").

Similarly, numerous state courts have held that a topic relating to conditions of employment cannot be subject to negotiated agreement if the proposal would require a public employer to fail to perform a duty imposed upon it by statute, or to perform the duty in a way contrary to the policy and purposes of the statute. *See, e.g., Lansing Assn' of School Adm'rs v. Lansing School Dist. Bd. of Educ.*, 216 Mich.App. 79, 549 N.W.2d 15, 23 (1996) (holding that provisions of CBAs of public employee organizations cannot "eliminate [the agency's] statutory obligations to the public merely by contracting to do so with [the] plaintiff"); *In re IFPTE Local 195 v. State*, 88 N.J. 393, 443 A.2d 187, 191–92 (1982) (noting that "the scope of negotiations in the public sector is more limited than in the private sector" because "the employer in the public sector is government, which has special responsibilities to the public not shared by the private sector[,]" and stating that "[i]f the Legislature establishes a specific term or condition of employment that leaves no room for discretionary action, then negotiation on that term is fully preempted." (Footnotes omitted.)); *Board of Educ. v. Public Employment Rel. Bd.*, 75 N.Y.2d 660, 555 N.Y.S.2d 659, 554 N.E.2d 1247, 1251 (1990) (recognizing that "in a few instances, however, what might otherwise be negotiable terms and conditions of employment are prohibited from being collectively bargained. For example, a statute may direct that certain action be taken by the employer, leaving no room for negotiation." (Citations omitted.)); *La Crosse v. Wisconsin Employment Rel. Comm'n*, 170 Wis.2d 155, 488 N.W.2d 94, 97 (1992) (stating that "[t]he public employer is not free to bargain with respect to a proposal which would authorize a violation of public policy or a statute.... The same principal logically extends to a proposal which requires the public employer to fail to perform a duty imposed upon it by statute or to perform that duty in a way contrary to the policy and purpose of the statute." (Citations omitted.), *rev'd on other grounds*, 180 Wis.2d 100, 508 N.W.2d 9 (1993)). We agree, and hold that a public employer is not free to bargain with respect to a proposal which would authorize a violation of a statute.

In the instant case, the confidentiality provision of the CBA purportedly requires the HPD to fail to perform its duty to disclose disciplinary records as mandated by HRS Chapter 92F, notwithstanding that the duty to provide access to government records is not discretionary under the UIPA. With respect to public records statutes, the virtually unanimous weight of authority holds that an agreement of confidentiality cannot take

precedence over a statute mandating disclosure. *See, e.g., Washington Post Co. v. United States Dept. of Health and Human* Servs., 690 F.2d 252, 263 (D.C.Cir.1982) (stating that "to allow the government to make documents exempt by the simple means of promising confidentiality would subvert FOIA's disclosure mandate"); *Anchorage School Dist. v. Anchorage Daily News,* 779 P.2d 1191, 1193 (Alaska 1989) (holding that "a public agency may not circumvent the statutory disclosure requirements by agreeing to keep the terms of a settlement agreement confidential. Under Alaska law, a confidentiality provision such as the one in the case at bar is unenforceable because it violates the public records disclosure statutes."); *Register Div. of Freedom Newspapers, Inc. v. County of Orange,* 158 Cal.App.3d 893, 205 Cal.Rptr. 92, 102 (1984) (explaining that "[a]ssurances of confidentiality are insufficient in themselves to justify withholding pertinent public information from the public.... We conclude that assurances of confidentiality ... are inadequate to transform what was a public record into a private one"); *Lieberman v. State Bd. of Labor Rels.,* 216 Conn. 253, 579 A.2d 505, 511 (1990) (holding that destruction of public employee disciplinary records is an illegal subject of bargaining because "[t]he duty and/or ability to bargain, however, is necessarily limited to those subjects to which the parties can legally agree.... As with contracts generally, the bargaining process and resulting agreements are subject to the restrictions and limitations of public policy as manifested in constitutions, statutes and applicable legal precedents.... The initial question that must be answered in determining the scope of public sector labor negotiations, therefore, is whether the parties involved in the bargaining process can *legally* agree to the subject in question." (Citations omitted and emphasis in original.)); *Mills v. Doyle,* 407 So.2d 348, 350 (Fla.Ct.App.1981) ("The trial court properly found the grievance records of teachers employed by the Palm Beach County School Board were public records within the purview of the [Freedom of Information] Act. In addition, the trial court was correct in shunting aside the argument that the [CBA] between the [teachers' association] and the School Board estab-

lished the confidentiality of the subject records, *for to allow the elimination of public records from the mandate of the [disclosure provisions] by private contract would sound the death knell of the Act."* (Emphasis added.)); *Anonymous v. Board of Educ. for the Mexico Cent. School Dist.,* 162 Misc.2d 300, 616 N.Y.S.2d 867, 870 (1994) (stating that "[i]n any event an agreement to keep secret that to which the public has a right of access under Article 6 of the Public Officers Law would be unenforceable as against public policy."); *Toledo Police Patrolmen's Ass'n, Local 10, IUPA v. City of Toledo,* 94 Ohio App.3d 734, 641 N.E.2d 799, 802 (1994) (holding that municipality's compliance with CBA was excused by law, where the CBA made confidential records that are public under the Ohio public records law, and reasoning that "the law is supreme, and no contract between individuals can make it lawful to do that which the statute positively commands shall not be done." (Citations and internal quotation marks omitted.)); *Trombley v. Bellows Falls Union High School Dist. No. 27,* 160 Vt. 101, 624 A.2d 857, 862 (1993) (stating that "[w]e agree with plaintiff that the contract cannot override the provisions of the Public Records Act, and the confidentiality provision was not a ground for denying plaintiffs access to the records").

 We agree and therefore hold that: (1) HRS Chapter 92 is not a "conflicting statute on the same subject matter" as HRS Chapter 89, within the meaning of HRS § 89–19, and thus is not preempted by HRS Chapter 89 or any collective bargaining agreement negotiated thereunder; (2) a topic relating to conditions of employment cannot be subject to negotiated agreement if the agreement would require a public employer to fail to perform a duty imposed upon it by statute; (3) the confidentiality provision in SHOPO's CBA with the City prevents the HPD from performing its duties under the UIPA and is therefore unenforceable; (4) whether the CBA between SHOPO and the City prohibits disclosure of disciplinary records is not a genuine issue of material fact because it is the provisions of HRS Chapter 92F, rather than those of the CBA, which govern the duty of disclosure; and (5) the

circuit court erroneously denied OIP's motion for summary judgment because there were no genuine issues of material fact and the OIP was entitled to judgment as a matter of law.

### III. *CONCLUSION*

For the reasons stated above, we affirm, in part, the circuit court's May 4 and June 16, 1995 orders granting summary judgment to SPJ; however, we remand this case to the circuit court with instructions to modify those orders to reflect that the HPD is ordered to provide SPJ access to all records responsive to SPJ's October 28, 1993 request, rather than its August 30, 1993 request. We affirm the circuit court's June 17, 1994 and December 28, 1994 orders awarding attorneys' fees to SPJ.

We vacate the circuit court's January 10, 1996 order denying OIP's motion for summary judgment and remand to the circuit court with instructions to enter an order granting OIP's motion for summary judgment. Also on remand, SHOPO and the Doe Officers may relitigate the constitutionality of HRS § 92F–14(b)(4); however, the circuit court is bound by our decision on the merits as discussed above.